[Crim. No. 34081. Second Dist., Div. Five. Aug. 21, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
ADAM SALAS RAMIREZ et al., Defendants and Appellants.

[Crim. Nos. 34526, 36126. Second Dist., Div. Five. Aug. 21, 1980.]

In re ADAM SALAS RAMIREZ on Habeas Corpus.

534

COUNSEL

Adam Salas Ramirez, in pro. per., Marilyn Garber, Evelyn Keller, under appointments by the Court of Appeal, Garber & Riskin and Baker & Burton for Defendants and Appellants and for Petitioner.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Shunji Asari, Roy C. Preminger, Howard J. Schwab and Donald F. Roeschke, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

ASHBY, J.—By jury trial appellants Adam Ramirez and Willie Ramirez were found guilty of grand theft (Pen. Code, § 487, subd. 1). The

jury also found true the allegation that the loss exceeded $100,000 (Pen. Code, § 12022.6, subd. (b)). Appellants were sentenced to state prison.

Appellants duped Home Federal Savings and Loan Association of San Diego into crediting Adam's $10 savings account at the Redondo Beach branch with $1.5 million, based upon a fictitious "wire transfer" of funds. Appellants then withdrew $1.4 million from this account. Adam and his fiancee, Carol Boyer,[1] went on a spending spree purchasing clothing and jewelry and cars and home furnishings for shipment to Ecuador. Adam was arrested at the airport boarding the plane to Ecuador.

FACTS

On February 6, 1978, Adam approached Gloria Dias, branch manager of the Redondo Beach branch of Home Federal Savings and Loan Association of San Diego, indicating that he would like to establish a savings account so that a large amount of money could be "wire transferred" into it. He indicated he and his associates were in the process of buying the Cockatoo Inn in Hawthorne, that he expected a wire transfer of $1.5 million, that he would probably immediately withdraw $900,000 of the money, but might invest $500,000 of the remaining funds at Home Federal.

On February 7, Adam telephoned Miss Dias and indicated he and his associates would use Home Federal. He asked what bank should be used for the wire transfer. She said Home Federal used the Bank of America for wire transfers. He said he and his associates would rather use another bank. Miss Dias checked with Kaye Hobson of the wire transfer department in Home Federal's main office in San Diego. Mrs. Hobson told her to try to convince appellant to use the Bank of America but that if appellant insisted, to use United California Bank rather than lose the account. Adam spoke to Miss Dias later in the day and said his associates definitely did not want to use the Bank of America. She told him he could use United California Bank (UCB). She gave him Home Federal's wire transfer account number at UCB and in-

---

[1]Boyer was charged as a codefendant but was acquitted. Appellants are brothers.

structed him to have the wire transfer made to the attention of Kaye Hobson at the Home Federal main office in San Diego.

Linda Robertson was Kaye Hobson's secretary, and was vaguely familiar with the fact that a wire transfer was expected. On the morning of February 8, while Kaye Hobson was out of the office, Miss Robertson received a phone call for Mrs. Hobson. She asked if she could take a message. The man at the other end of the line said, "This is Garcia of Union Bank." He asked Robertson if she knew anything about the $1.5 million wire transfer they were receiving. She replied she did not know the details but could take a message. He said they had received the $1.5 million for Ramirez at Redondo Beach and gave her an account number.

Shortly thereafter, Gloria Dias called Linda Robertson to find out if the money had been received. She said it had. Mrs. Hobson returned to her office and Robertson gave her a similar message. Unfortunately, she failed to mention the names "Garcia" or "Union Bank" and thus neither Miss Dias nor Mrs. Hobson was alerted to the discrepancy from the original plan. Mrs. Hobson instructed Miss Dias how to credit Adam's account and that withdrawals could be made immediately.

Adam spoke to Gloria Dias on the phone the morning of February 8 and was told the funds had been received. He asked if he could send someone in to pick up a cashier's check for $900,000. She said he could if he sent written authorization. Later that day Joe Torres came in with a note signed by Adam requesting that a cashier's check for $900,000 be released to his nephew, Joe Torres. The signature on the note matched Adam's signature card and Miss Dias authorized the withdrawal, handling Joe Torres a cashier's check for $900,000 payable to Adam.

On February 9, Adam and Carol Boyer came into the Redondo Beach branch and withdrew another $100,000 as follows: a cashier's check for $46,500, payable to Boyer; a cashier's check for $35,997.39, payable to Champion Chevrolet; a cashier's check for $8,900, payable to Foundation Mortgage; a cashier's check for $5,010, payable to American Express; and $3,602.61 in cash to Adam. Adam indicated he would come back the following Monday to sign papers to place the remaining $500,000 into a long-term account.

On February 8, Adam took the $900,000 cashier's check to the California First Bank in Lomita and opened an account. The manager, Clyde Baumgardner, told Adam the account could not be credited until the check cleared. He and Adam agreed the matter could be expedited by Baumgardner's hand delivering the check to the Home Federal Redondo Beach branch. On February 9, Mr. Baumgardner took the check to Home Federal where it was exchanged for a $900,000 cashier's check payable directly to California First Bank. Baumgardner deposited the check in the California First account Adam had opened the previous day.

On February 10, Adam withdrew $777,000 from the California First account in cashier's checks as follows: $500,000, payable to appellant Willie Ramirez; $250,000, payable to Carol Boyer; $15,000, payable to Willie; and $12,000, payable to Farber and Company.

On February 10, Willie brought the $15,000 check into California First Bank and cashed it. On February 13, Willie brought the $500,000 cashier's check into California First Bank. He asked if he could cash it or open an account. At a teller's suggestion, the $500,000 check was broken down into a series of $50,000 checks. Willie obtained a cashier's check for $6,695.70, payable to Mid-County Chrysler, and $1,000 in cash. He opened a checking and savings account for approximately $92,000. He had eight $50,000 checks remaining. He wanted to cash them but was told the bank did not have that much cash. An order was placed for a large amount of cash so that the bank could cash the checks in a couple of days.

On February 13, Adam withdrew $78,450 from the California First account as follows: a cashier's check for $75,000, payable to Carol Boyer; a cashier's check for $1,450, payable to Long Beach Moped; and $2,000 in cash.

Carol Boyer had a checking account at the Bank of San Pedro, which had never had a larger deposit than $660. On February 9, $5,000 was deposited to this account. On February 10, Adam and Boyer entered the Bank of San Pedro and presented the $250,000 cashier's check from California First Bank, payable to Boyer. They deposited $42,000 in Boyer's checking account and received the following: $8,000 cash; a $100,000 cashier's check, payable to Adam; and a $100,000 cashier's check, payable to Mario Bustos. That day, Boyer cashed another $8,000

check at her bank. On February 13, Adam and Boyer entered the Bank of San Pedro and exchanged the $100,000 check payable to Mario Bustos for two $50,000 checks payable to Adam. They also deposited a $75,000 check, payable to Boyer, into Boyer's account but withdrew $8,000 in cash.

On February 13, Willie entered the Home Federal Redondo Beach branch and presented a note signed by Adam requesting a check for $400,000 payable to Willie. After verification of Adam's signature, a $400,000, check was delivered to Willie.

Between February 11 and February 14, Adam and Carol purchased many thousand dollars' worth of clothing, jewelry, appliances and home furnishings, in addition to the three cars they purchased on February 9 from Champion Chevrolet, and they arranged with Farber and Company, an export packing firm, to ship the merchandise to Ecuador.

Home Federal's mistake was not discovered until February 14 when Mrs. Hobson became alarmed that she had not yet received written confirmation of the wire transfer, as was the usual custom. Upon checking, she discovered that there was no Garcia at Union Bank, and Home Federal never received $1.5 million for Adam.

On February 14, Adam was arrested at Los Angeles International Airport boarding a flight to Ecuador. He had in his possession the $100,000 cashier's check payable to him from Bank of San Pedro and the two $50,000 cashier's checks payable to him from the Bank of San Pedro. At the home of Adam and Willie's brother, Henry Ramirez, the $400,000 Home Federal cashier's check payable to Willie was recovered. Henry also turned over to the police the eight cashier's checks for $50,000 each, payable to Willie, and the cashier's check for $6,695.70, payable to Mid-County Chrysler.

Adam testified in his own defense. Willie did not. Adam testified that he and Willie were planning to invest in a restaurant in South America, that Willie was supposed to be arranging the loan with a loan broker, and that he, Adam, assumed the loan had been arranged and that he was entitled to make the withdrawals and spend all the money which he did. Carol Boyer testified that Adam kept secret from her the details of his business transactions and that she also thought the money had been legitimately obtained.

## Penal Code Section 12022.6

■ Appellants contend the evidence is insufficient to support the two-year enhancement of their sentences under Penal Code section 12022.6.[2] Appellants argue the enhancement is applicable only if the victim's ultimate out-of-pocket loss exceeds $100,000 and there is no chance of recovery. Appellants argue that although $1.4 million was withdrawn from the Home Federal account, it was up to the prosecution to prove that Home Federal did not recover at least $1.3 million of it. They argue that some cashier's checks were recovered unspent, that Carol Boyer had safety deposit boxes where some of the cash might be kept and might be subject to seizure, that some of the checks to merchants and other third parties (which themselves totaled more than $100,000) may have been stopped, and that Home Federal might recover some of its losses by disposing of the merchandise Adam and Carol Boyer purchased. Appellants argue that to the extent the record is ambiguous as to these matters, proof of the allegation under section 12022.6 was insufficient.

We find no merit to this argument. The parties have not cited nor have we found any legislative history which is helpful in construing the intention of this section. (See generally Cassou & Taugher, *Determinate Sentencing in California: The New Numbers Game* (1978) 9 Pacific L.J. 5, 44-45.) The obvious purpose of the statute is to deter large-scale crime. We think the Legislature did not intend that the application of section 12022.6 should depend upon the fortuitous circumstances of whether the police were able to recover stolen property or the victim was able to establish a civil claim for the return of property or its proceeds traced by some circuitous route.[3] To interpret the statute in the manner suggested by appellants would be to attribute to the Legislature an intent to depart radically from well-established law that the recovery of stolen property by the victim is no defense to crime and is only relevant in mitigation of punishment when the defendant voluntarily returns it prior to being charged. (*People v. Williams* (1956)

---

[2]Penal Code section 12022.6 provides in pertinent part: "Any person who takes, damages or destroys any property in the commission or attempted commission of a felony, with the intent to cause such taking, damage, or destruction, and the loss exceeds:... [¶] (b) One hundred thousand dollars ($100,000), the court shall in addition and consecutive to the punishment prescribed for the felony or attempted felony of which the defendant has been convicted impose an additional term of two years."

[3]The term "loss" may have been used in the statute because it more aptly describes the circumstances when property is damaged or destroyed as distinguished from taken.

145 Cal.App.2d 163, 166-167 [302 P.2d 393]; *People v. Baker* (1923) 64 Cal.App. 336, 342-343 [221 P. 654]; *People v. Kirwin* (1927) 87 Cal.App. 783, 785 [262 P. 803]; *People v. Holmes* (1970) 5 Cal.App.3d 21, 25 [84 Cal.Rptr. 889].)

Appellants' contentions that section 12022.6 is unconstitutionally vague, that the jury was inadequately instructed on its meaning, that the information gave appellants insufficient notice of the charge, and that appellants were precluded from arguing their interpretation to the jury, are based upon appellants' erroneous interpretation of the statute. Adam's contention that he was never arraigned on the allegation is refuted by the augmented record. Finally, section 12022.6 does not violate Penal Code section 654. (See *People v. White* (1976) 16 Cal.3d 791, 795 [129 Cal.Rptr. 769, 549 P.2d 537].)

THEFT

In arguments reminiscent of the hypertechnicality of the common law of theft (see *People v. Ashley* (1954) 42 Cal.2d 246, 258 [267 P.2d 271]), appellants raise numerous contentions about the pleading, instructions, and sufficiency of evidence of theft. None of these contentions has merit.

■ Adam contends the People should not have been allowed to plead that appellants committed theft "between the 6th day of February, 1978, and the 15th day of February, 1978." He argues the prosecution was required to pick a single point in time when "the" theft occurred. On the contrary, the evidence supports the conclusion there was a series of thefts. (See *People v. Bailey* (1961) 55 Cal.2d 514, 518-519 [11 Cal.Rptr. 543, 360 P.2d 39].) Willie argues the theft was complete upon the crediting of Adam's account with $1.5 million and therefore Willie was guilty only of receiving stolen property. However, until money was "withdrawn" from the account, the element of asportation was missing.

■ The jury was instructed on theft by trick and device, theft by false pretenses, and embezzlement. It is not necessary that the jury agree upon which category of theft was committed, so long as there is sufficient evidence of at least one of the types of theft. (*People v. Ashley, supra,* 42 Cal.2d 246; *People v. Nor Woods* (1951) 37 Cal.2d 584, 586 [233 P.2d 897].) ■ Appellants contend the evidence is insuffi-

cient to show any of the three types of theft, but this argument is unconvincing.

First, Adam contends that the element of reliance necessary for theft by trick and theft by false pretenses was missing. He contends Home Federal relied solely upon the phone call from "Garcia" and the advice of Linda Robertson and Kaye Hobson, and not upon anything said by Adam. However, the circumstances justified the inference that the mysterious "Garcia" was either Adam, Willie, or some coconspirator. Moreover, Adam proposes to ignore the statements by him "setting up" the victim, indicating that $1.5 million would be transferred to his account. The jury could reasonably infer the Home Federal employees relied upon these statements as well. Appellants' various activities and the suspicious circumstances surrounding the case were sufficient to provide corroboration of false pretenses as required by Penal Code section 1110.

■ Adam points out that theft by trick is distinguished from theft by false pretenses, depending upon whether the victim intended to pass "title." He proposes to involve the court in a sophistic discussion of whether Home Federal was passing "title" to appellants. We decline to do so. We do not think the trial court erred in instructing on both theories or in failing to further define "title," but even if it did the error would be harmless since appellants' defense did not really hinge upon this distinction. (*People* v. *Ashley, supra,* 42 Cal.2d 246, 258-259.)

■ The trial court was not required on its own motion to instruct on attempted grand theft, since the evidence showed that if guilty at all, appellants were guilty of the greater offense. (*People* v. *Mills* (1977) 73 Cal.App.3d 539, 545 [140 Cal.Rptr. 803].)

Citing *People* v. *Stewart* (1976) 16 Cal.3d 133, 139-142 [127 Cal. Rptr. 117, 544 P.2d 1317], Adam contends the trial court erred in failing to instruct *sua sponte* that it is a defense to embezzlement that a defendant believed in good faith he was authorized to take the money entrusted to him. However, in this case the jury was instructed that embezzlement consists of the "fraudulent" appropriation of money and that "[a]n act committed or an omission made under an ignorance or mistake of fact which disproves any criminal intent is not a crime." Unlike the particular circumstances in *Stewart,* under the instructions given here the jury was aware that Adam would not be guilty if he be-

lieved the $1.5 million had actually been deposited representing a loan arranged by Willie.[4]

With regard to Willie's contentions on the sufficiency of evidence, we need not discuss again the three theories of theft, since the evidence is sufficient to hold Willie responsible with Adam as an aider and abettor or coconspirator. ▮ Willie himself withdrew a cashier's check for $400,000 from Home Federal on February 13, presenting a note signed by Adam authorizing the withdrawal. Adam made payable to Willie two cashier's checks withdrawn from California First Bank on February 10, one for $500,000 and the other for $15,000. Willie cashed the $15,000 check later that day, and attempted to cash the $500,000 check on February 13. He opened an account for $92,000, received $1,000 cash and a check for $6,695 payable to Mid-County Chrysler, but was unable to cash the remaining $400,000 because the bank lacked that much cash. When arrested at the airport, Adam had in his possession a note stating, "I Adam Ramirez received $875,000 from Willie Ramirez. [Signed] Adam S. Ramirez"; a note saying, "Hi, Gloria. Will you please make out a check to my brother for $400,000. Name"; and a California First Bank purchaser's receipt dated February 13 for a cashier's check payable to Willie S. Ramirez in the amount of $50,000. During his discussion with Gloria Dias, Adam several times indicated he had associates. In his testimony, Adam stated that it was Willie who allegedly arranged for a $1.5 million loan.

▮ In these circumstances the trial court also acted properly in instructing the jury on conspiracy. It is not necessary for a conspiracy to have been charged. (*People* v. *Teale* (1965) 63 Cal.2d 178, 188 [45 Cal.Rptr. 729, 404 P.2d 209]; *People* v. *Joines* (1970) 11 Cal.App.3d 259, 269 [89 Cal.Rptr. 661].)

### OTHER INSTRUCTIONS

▮ Adam contends the court erred in instructing on flight.[5] Adam contends his going to the airport was not "immediately" after the crime.

[4]Of course, the jury was not required to accept Adam's testimony that this is what he believed.

[5]The court instructed the jury as follows: "The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by you in the light of all other proved facts in deciding the question of his guilt or innocence. The weight to which such circumstance is entitled is a matter for

(Pen. Code, § 1127c.) As the trial court suggested, however, in circumstances like these involving a series of thefts of a great amount of money and where the alleged flight consists of preparing to move to another country, which naturally takes some time to arrange, the jury could reasonably infer the flight was immediately after the crime. The instruction properly left it to the jury to determine whether Adam's conduct constituted flight. (*People* v. *Cannady* (1972) 8 Cal.3d 379, 391 [105 Cal.Rptr. 129, 503 P.2d 585]; *People* v. *Watson* (1977) 75 Cal.App.3d 384, 402-403 [142 Cal.Rptr. 134]; see also *People* v. *Terry* (1970) 2 Cal.3d 362, 395 [85 Cal.Rptr. 409, 466 P.2d 961].)

■ Apparently through inadvertence, the trial court neglected to strike the words "or after he is accused of a crime that has been committed" from the instruction, there being no evidence of a prior accusation. This error was harmless. (*People* v. *Watson, supra*, at p. 403; *People* v. *Vasquez* (1979) 94 Cal.App.3d 42, 45 [156 Cal.Rptr. 235].)

■ Adam contends the trial court erred in giving CALJIC No. 2.62, which provides in pertinent part that if the jury finds a defendant "failed to explain or deny any evidence or facts against him which he can reasonably be expected to deny or explain because of facts within his knowledge, you may take that failure into consideration as tending to indicate the truth of such evidence and as indicating that among the inferences that may be reasonably drawn therefrom those unfavorable to the defendant are the more probable." He contends he offered a complete explanation or denial and that therefore the evidence did not warrant giving the instruction. (See *People* v. *Saddler* (1979) 24 Cal.3d 671, 682-683 [156 Cal.Rptr. 871, 597 P.2d 130].) This contention has no merit because there were huge material gaps in Adam's explanation that he believed the money had been deposited legitimately as a result of a loan negotiated by Willie. (*Id.*, at p. 683, fn. 9.) Adam never was able to explain how a $1.5 million loan for a restaurant in South America was made payable to him although he signed no loan papers, had no collateral, and had never met the alleged loan broker. He was unable to explain how the alleged loan for such a large amount could have no strings attached and could permit him to spend many thousand dollars from it for his own personal use. The record thus supports the giving of

---

the jury to determine. Whether the defendant's conduct constituted flight is a question for you the jury to decide." (CALJIC No. 2.52, as modified by adding the last sentence.)

the instruction. Furthermore, even assuming Adam offered an explanation for all the evidence against him and that the instruction should not have been given, the error would be harmless in light of the incredibility of Adam's uncorroborated story. (*People* v. *Saddler, supra*, 24 Cal.3d at pp. 683-684.)

## SENTENCING

The court sentenced Adam to an upper term of four years plus two years for the enhancement under Penal Code section 12022.6. Adam raises various contentions about the probation report and the sentencing hearing, none of which has merit.

He argues the probation report was not timely made available, that it was not "objective," or "tailored to appellant," and that it was based on intuition and a cursory investigation. ▮ No objection as to the timeliness of the report was made by trial counsel, who argued vigorously on Adam's behalf. The issue was waived. (See *People* v. *Medina* (1978) 78 Cal.App.3d 1000, 1006-1007 [144 Cal.Rptr. 581].) There is no showing Adam lacked adequate notice of the report or the circumstances which could be relied upon to impose an upper term. (See *People* v. *Thomas* (1979) 87 Cal.App.3d 1014, 1020-1021 [151 Cal. Rptr. 483].) A reading of the probation report shows Adam's claims of defects to be totally without merit. Adam was not deprived of the effective assistance of counsel by the omission of trial counsel to raise these unsubstantial objections below.

▮ The court adequately stated its reasons for denying probation and for imposing the upper term, that the planning and sophistication with which the crime was carried out indicate premeditation, and that Adam had two other convictions involving fraud upon restaurants where he had worked. Unlike prior felony convictions charged under Penal Code section 667, it was not necessary that Adam have served prison terms on the other offenses. The trial record supported the inference of Adam's heavy involvement in planning and carrying out the scheme, notwithstanding Adam's claim to the probation officer that appellants' uncharged brother, Henry Ramirez, masterminded it.

▮ Finally, Adam's claim to good-time/work-time credits on his sentence should first be pursued administratively through the Department of Corrections. (*People* v. *Sage* (1980) 26 Cal.3d 498, 507 [165 Cal.Rptr. 280, 611 P.2d 874].)

The judgments are affirmed. The petitions for writs of habeas corpus are denied.

Stephens, Acting P. J., and Hastings, J., concurred.

The petition of appellant Adam Salas Ramirez for a hearing by the Supreme Court was denied October 15, 1980.