[Crim. No. 32293. Second Dist., Div. Five. Jan. 2, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
KELSEY AUGUSTA THOMAS, Defendant and Appellant.

**COUNSEL**

Lee B. Ackerman, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, and Jeffrey A. Joseph, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

KAUS, P. J.—A jury found defendant guilty of second degree murder. (Pen. Code, § 187.) The jury also found that defendant used a firearm in the commission of the offense. (Pen. Code, § 12022.5.) The court found aggravating factors and sentenced defendant to the "upper" term of seven years and added two years for the use finding. Defendant was therefore sentenced to state prison for 9 years, less 151 days credit for time served.

### FACTS

The homicide of Gwendolyn Hurston occurred in the early morning hours of August 7, 1977, at a party hosted by Thomas Ligon. The prosecution case was based primarily upon the eyewitness testimony of Ligon, Darnell Reynolds, boyfriend of the victim, and Daryl and Edward Reynolds, Darnell's brothers.

Defendant, wearing a full leg cast and using crutches, arrived at the party at about 11 p.m. on August 6, accompanied by his two sisters, Lillie and Audrey, his brother Don, Donald Watts and Matthew Coles. Soon after defendant arrived, defendant showed Ligon a small caliber revolver which Ligon placed in the waistband of his pants, where he had already placed the revolver of another guest.

Sometime after midnight, defendant asked for the return of his revolver and Ligon complied. At about 1 a.m., Ligon heard an argument going on between defendant and Darnell Reynolds at the front of the house. About 10 to 15 people were gathered around defendant and Reynolds. After warning the two men to stop arguing or he would call off the party, Ligon turned to go back into the house. At that point, he heard a gunshot. Three to four seconds later he heard another gunshot. When he turned around, he saw Gwendolyn Hurston lying on the ground, Darnell Reynolds standing next to her, and defendant standing with a gun in his hand pointed at Darnell Reynolds. Defendant and the people he had come with quickly left the scene. It was later determined that the victim died of a small caliber gunshot wound to the head.

The testimony of Darnell, Daryl and Edward Reynolds to the events surrounding the argument and shooting was similar to that of Ligon except that each of the three men actually saw defendant fire the gun. Darnell was standing immediately to defendant's left when the fatal shots

were fired. Daryl and Edward were standing in the immediate vicinity. Both Daryl and Edward saw flashes from the gun held by defendant as they heard the shots being fired.

When Los Angeles Sheriff's deputies arrived at the scene at about 1:30 a.m., defendant was not present. The deputies transported about 30 people from the party to the sheriff's station. At the station, the deputies spoke with Ligon and with Darnell and Daryl Reynolds.

Defendant was arrested at his home later in the day on August 7. No revolver or firearm was recovered.

The defense version of the night's events conflicted sharply with the People's case. The defense witnesses were defendant and the people with whom he had come to the party—his two sisters and his brother, his sister's boyfriend Matthew Coles, and Donald Watts. They all testified that they were present during the argument between defendant and Darnell Roberts at the time the shots were fired. They uniformly stated that defendant did not have a gun in his possession at any time on the night in question and that the gunshots appeared to come from the porch of the house, where Thomas Ligon was standing. When they turned to look at Ligon, he was holding a gun in his hand.

On appeal, defendant argues that the evidence was insufficient to support the verdict, that the trial court erred in failing to instruct the jury *sua sponte* on the sufficiency of circumstantial evidence to support a finding of guilt (CALJIC No. 2.01), and that the sentencing procedures employed were constitutionally inadequate.

DISCUSSION

1. *Sufficiency of Evidence.*

█ Relying primarily upon *People* v. *Reyes* (1974) 12 Cal.3d 486 [116 Cal.Rptr. 217, 526 P.2d 225] and *People* v. *Bassett* (1968) 69 Cal.2d 122 [70 Cal.Rptr. 193, 443 P.2d 777], defendant contends that various inconsistencies between the testimony of Ligon and the Reynolds brothers, and other inconsistencies between the prosecution witnesses' trial testimony and their testimony at the preliminary hearing, rendered the evidence of guilt insufficient as a matter of law. However, in *Reyes* the conviction was reversed because the case against the defendant consisted entirely of circumstantial evidence which could be said to support the conviction

only by arbitrary application of a series of tenuous hypotheses. (*People* v. *Reyes, supra,* 12 Cal.3d at pp. 498-500.) In *Bassett,* the Supreme Court reduced a first degree murder conviction to second degree because the evidence relied upon to negative the defendant's diminished capacity defense was the testimony of two psychiatrists who had never examined defendant and whose testimony was wholly conclusionary and hypothetical, and the testimony of a third psychiatrist whose conclusion was self-contradictory. (*People* v. *Bassett, supra,* 69 Cal.2d at pp. 140, 148.)

Nothing comparable to the severe deficiencies of proof found in *Reyes* and *Bassett* is present here. Many of the claimed inconsistencies dealt with testimonial differences in the chronology of the events and the relative positions of the participants. Given the fact that the incident occurred rather suddenly at a fairly well attended party, it is not surprising that the recollections of the witnesses varied in some details; however, the crucial testimony of the Edwards brothers that they had seen defendant fire the gun was not materially different from what they had testified to at the preliminary hearing. All of the claimed inconsistencies were comprehensively recounted by defense counsel in his argument to the jury; it was the jury's function to reconcile any conflicts and evaluate the credibility of the witnesses.

## 2. *Circumstantial Evidence Instruction.*

▇▇ Defendant argues that in view of the duty of the trial court to instruct the jury on general principles of law relevant to the facts of the case (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 715-716 [112 Cal.Rptr. 1, 518 P.2d 913]), the court below erred in that it failed to instruct the jury that a conviction could be based on circumstantial evidence only if that evidence was irreconcilable with any other rational conclusion (CALJIC No. 2.01).

Of course, when the prosecution evidence is primarily direct evidence and the circumstantial evidence is simply corroborative, the subject instruction need not be given. (*People* v. *Wiley* (1976) 18 Cal.3d 162, 174 [133 Cal.Rptr. 135, 554 P.2d 881]; *People* v. *Malbrough* (1961) 55 Cal.2d 249, 250-251 [10 Cal.Rptr. 632, 359 P.2d 30]; *People* v. *Hernandez* (1970) 11 Cal.App.3d 481, 498 [89 Cal.Rptr. 766].) Defendant seeks to circumvent that longstanding rule by arguing that in the present case the eyewitness testimony of the Reynolds was "so fraught with inconsistencies" that it cannot truly be considered to have been "direct evidence."

Defendant's argument confuses mutually exclusive concepts. ██ Evidence Code section 410 defines "direct evidence" as "evidence that directly proves a fact, without an inference or presumption, and which in itself, if true, conclusively establishes that fact." As the definition makes clear, the characterization of evidence as "direct" does not depend upon its strength or weakness as affected by extrinsic factors such as impeachment; rather, evidence is "direct" if, *assuming it is true,* it establishes a fact without the aid of an inference or presumption. The eyewitness evidence offered by the Reynolds brothers fits the definition. ██ Since Ligon's testimony was merely corroborative of that direct evidence, delivery of CALJIC No. 2.01 would have been inappropriate.

### 3. *Sentencing Issues.*

At sentencing, counsel for defendant announced that there was "no legal cause why sentence should not now be imposed." The court then sentenced defendant to seven years in state prison, the "upper term" for second degree murder. (Pen. Code, § 190.) The court stated its reason for imposing the upper term: "The higher term of the base is imposed because of the fact that the defendant has been involved in using firearms and carrying firearms previous to this offense, has been in trouble as a juvenile, and further, the victim in this case, was an entirely innocent and uninvolved young lady whose life was taken with absolutely no rhyme or provocation or excuse whatever."

### A. *Notice*

██ Although no objection was interposed at that time, defendant now contends that he was entitled to notice of the grounds upon which the court intended to rely in ordering the upper term. He also implies that Penal Code section 1170, subdivision (b) is constitutionally deficient in failing to provide for such notice.

If it signifies nothing else, the lack of an appropriate objection below suggests that at least the trial court did not perceive the problem defendant now raises. In fact, the statutory scheme does contemplate ample notice; and it is clear the defendant had such notice in this case.

Penal Code section 1170, subdivision (a)(2) states, in pertinent part: "In sentencing the convicted person, the court shall apply the sentencing rules of the Judicial Council." Those rules appear in the California Rules

of Court. Relevant here is California Rules of Court, rule 421, which lists 17 different "circumstances in aggravation."[1]

The Penal Code and Rules of Court also identify the sources from which facts in aggravation and mitigation may be gleaned. Penal Code section 1170, subdivision (b) permits the court to consider "the record in the case, the probation officer's report, other reports including reports received pursuant to [Penal Code] Section 1203.03 and statements in aggravation or mitigation submitted by the prosecution or the defendant, and any further evidence introduced at the sentencing hearing. . . ." California Rules of Court rule 439(b) requires that the circumstances in aggravation or mitigation be established from the above sources by a preponderance of the evidence.

Thus the statutes and rules of court identify not only the grounds upon which the court may exercise its discretion to designate the upper term, but also the sources from which the facts in support of aggravation are to be obtained. These sources are available to the defense well before sentencing; the probation report must be filed at least nine days before sentencing (Pen. Code, § 1203); statements in aggravation must be filed at least four days before sentencing (Pen. Code, § 1170); obviously, the facts adduced at the trial will be known to the defendant some time prior to sentencing (see Pen. Code, §§ 1191, 1203). We conclude that the method of delineating the bases for aggravation and the sources from which facts in aggravation may be found—a process somewhat akin to the notice function played by the preliminary hearing (see *People* v. *Foster* (1926) 198 Cal. 112, 119-121 [243 P.2d 667]; *People* v. *Roth* (1934) 137 Cal.App. 592, 607-608 [31 P.2d 813])—provides a defendant with ample notice of the potential grounds for aggravation.

In the present case, the grounds upon which the court relied in ordering the upper term were derived from the facts proved at trial and from the probation report. Sentencing occurred on January 16, 1978. The jury's verdict was delivered on December 19, 1977. The probation report was filed on January 6, 1978. Not only did the report recount defendant's past proclivity for carrying firearms and his gang-related activities, but it also explicitly stated, "In aggravation, one would note that defendant was engaged in a pattern of violent conduct which is culiminated [*sic*] in the present offense." Clearly the notice here was sufficient.

---

[1]Twelve of these "circumstances in aggravation" are "facts relating to the crime," five are "facts relating to the defendant."

## B. Rules of Court

 Defendant attacks the California Rules of Court which relate to sentencing (Cal. Rules of Court div. 1-A), arguing that they are impermissibly vague and allow a virtually "unbridled judicial discretion." Specifically he points to rule 410, which sets forth seven "general objectives of sentencing."[2] He claims that rule 410 conflicts with the Legislature's declaration that "the purpose of imprisonment for crime is punishment," which purpose is "best served by terms proportionate to the seriousness of the offense . . . ." (Pen. Code, § 1170, subd. (a)(1).) He also focuses upon the "circumstances in aggravation" (Cal. Rules of Court, rule 421), which he asserts are not framed with the specificity traditionally required of criminal statutes. (See, e.g., *Lanzetta* v. *New Jersey* (1939) 306 U.S. 451, 453 [83 L.Ed. 888, 890, 59 S.Ct. 618]; *People* v. *McCaughan* (1957) 49 Cal.2d 409, 414 [317 P.2d 974].)

 The answer to defendant's first point is clear if the statutes and rules are carefully read. The legislative declaration that imprisonment has a punitive purpose is in no way inconsistent with the notion that the sentencing process as a whole has a variety of objectives. Obviously, dispositions as diverse as unsupervised probation, probation with some time in county jail, and imprisonment in the state prison serve a variety of purposes including rehabilitation and restitution. (See *People* v. *Richards* (1976) 17 Cal.3d 614, 620 [131 Cal.Rptr. 537, 552 P.2d 97].)

Moreover, the statement of purpose contained in Penal Code section 1170, subdivision (a)(1) is not the only such statement contained in the determinate sentencing law: in setting forth the standards for retroactive application of the determinate sentencing law by the Community Release Board to persons convicted under the old indeterminate sentence law, Penal Code section 1170.2, subdivision (b) states that ". . . the board shall be guided by the following finding and declaration hereby made by the Legislature: that the necessity to protect the public from repetition of extraordinary crimes of violence against the person is the paramount consideration." This legislative recognition that imprisonment can perform a protective as well as a punitive function seems to us a clear indication that the Legislature did not intend the statement of purpose in section 1170, subdivision (a)(1) to be exhaustive.

---

[2] "(a) Protecting society. (b) Punishing the defendant. (c) Encouraging the defendant to lead a law abiding life in the future and deterring him from future offenses. (d) Deterring others from criminal conduct by demonstrating its consequences. (3) Preventing the defendant from committing new crimes by isolating him for the period of incarceration. (f) Securing restitution for the victims of crime. (g) Achieving uniformity in sentencing."

■ Nor are we persuaded that the "circumstances in aggravation" enumerated in rule 421[3] must fall because they have not been drafted with the narrowness and precision we require in statutes defining criminal offenses. The fundamental policy behind the constitutional prohibition of vaguely worded criminal statutes was stated in *Lanzetta* v. *New Jersey, supra,* 306 U.S. at page 453 [83 L.Ed.2d at page 890]: "No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids. . . ." The primary function of rule 421, however, is quite different. The Legislature authorized the Judicial Council to adopt the guidelines contained in rule 421 (and the other rules setting forth sentencing guidelines) in order to ". . . promote uniformity in sentencing . . . by the adoption of rules providing criteria for the consideration of the trial judge at the time of sentencing . . . ." (Pen. Code, § 1170.3.)

The functional difference between penal statutes and the rules of court on sentencing explain why the latter must necessarily be framed more broadly than the former. Obviously the list of "circumstances in aggravation" in rule 421 is not intended to give people advance warning of prohibited activities; rather it is designed to provide guidance to sentencing judges. Moreover, the 17 factors listed are intended to

---

[3]Rule 421 stated: "Circumstances in aggravation include: (a) Facts relating to the crime, including the fact that: (1) The crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness or callousness, whether or not charged or chargeable as an enhancement under section 12022.7. (2) The defendant was armed with or used a weapon at the time of the commission of the crime, whether or not charged or chargeable as an enhancement under section 12022 or 12202.5. (3) The victim was particularly vulnerable. (4) The crime involved multiple victims. (5) The defendant induced others to participate in the commission of the crime or occupied a position of leadership or dominance of other participants in its commission. (6) The defendant threatened witnesses, unlawfully prevented or dissuaded witnesses from testifying, suborned perjury, or in any other way illegally interfered with the judicial process. (7) The defendant was convicted of other crimes for which consecutive sentences could have been imposed but for which concurrent sentences are being imposed. (8) The planning, sophistication or profession-alism with which the crime was carried out, or other facts, indicate premeditation. (9) The defendant used or involved minors in the commission of the crime. (10) The crime involved an attempted or actual taking or damage of great monetary value, whether or not charged or chargeable as an enhancement under section 12022.6. (11) The crime involved a large quantity of contraband. (12) The defendant took advantage of a position of trust or confidence to commit the offense. (b) Facts relating to the defendant, including the fact that: (1) He has engaged in a pattern of violent conduct which indicates a serious danger to society. (2) The defendant's prior convictions as an adult or adjudications of commission of crimes as a juvenile are numerous or of increasing seriousness. (3) The defendant has served prior prison terms whether or not charged or chargeable as an enhancement under section 667.5. (4) The defendant was on probation or parole when he committed the crime. (5) The defendant's prior performance on probation or parole was unsatisfactory."

be applicable to all offenses: property crimes, crimes against the person, sex offenses, drug offenses—the lot. Any finite set of standards intended to be applied across such a broad spectrum of human activity must partake of a certain amount of vagueness which would be impermissible if those standards were attempting to define specific criminal offenses.

### 4. *Standard of Proof.*

Finally, defendant argues that California Rules of Court, rule 439, is unconstitutional in that it permits proof of circumstances in aggravation to be proved by a preponderance of evidence standard rather than by proof beyond a reasonable doubt. This issue was recently resolved against defendant's position in *People* v. *Nelson* (1978) 85 Cal.App.3d 99, 102-104 [149 Cal.Rptr. 177]. Defendant adds nothing to the discussion to convince us that the *Nelson* court was wrong.

The judgment is affirmed.

Ashby, J., and Hastings, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied March 29, 1979. Bird, C. J., and Manuel, J., did not participate therein.