[Crim. No. 13455. Fourth Dist., Div. One. Oct. 18, 1983.]

THE PEOPLE, Plaintiff and Respondent, v.
EDWARD MARTIN SANCHEZ, Defendant and Appellant.

**COUNSEL**

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Handy Horiye, Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Jay M. Bloom and John W. Carney, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**STANIFORTH, J.**—Defendant Edward Martin Sanchez pleaded not guilty by reason of insanity to an information charging him with rape (Pen. Code,

§ 261, subd. (3)), oral copulation (Pen. Code, § 288a, subd. (c)), and with a deadly weapon allegation for use of a broken bottle (Pen. Code, § 12022.3, subd. (a)), in each count. It was also alleged Sanchez had suffered convictions and prison terms on four occasions. Sanchez admitted the first three priors; the allegation of the fourth was dismissed.

A jury trial found Sanchez guilty on all counts and the enhancements as charged. On trial of the sanity issue, the jury found Sanchez sane. Sanchez was sentenced to a prison term for a total of fourteen years, eight years as the upper term for rape, three years for weapons use enhancement and three years for the second prior. The middle term of six years was assessed for the oral copulation and ordered to run concurrently. Sanchez appeals contending multiple errors by the trial court resulted in denial of a fair trial.

## FACTS

Victim Deborah B. was four and a half months pregnant. She awoke about sunrise and went for a walk on Imperial Beach. As she headed towards a restroom, she saw two people, a woman sitting on a wall and Sanchez walking nearby. Deborah entered the restroom and sat down in a doorless stall. She heard someone come into the restroom so she stood up and pulled up her pants. Sanchez appeared holding a broken beer bottle. He told her to do what he demanded or he would kill her. He put the bottle in his pocket. He ordered her not to scream, backed her against the wall, removed her coat and put the coat on the floor. Deborah cried while Sanchez removed her maternity shirt and bra. He then said "Wait here" and went outside. He returned in a few seconds and told Deborah if anyone came in she was to be his girlfriend and directed her to sit on the toilet. He pulled down his pants and made her orally copulate him. Then he began to rape her but said she was too dry. He got angry, told her to stand up and forced her to orally copulate him a second time. Sanchez dressed and took a ring from Deborah's key ring. He told her that if she told anyone, he would find her and kill her, and she must wait 10 minutes after he left before leaving the restroom.

Deborah immediately left the restroom and went to a friend's house nearby. She told the friend what had happened. The police were called and Deborah was taken to the hospital. On the way to the hospital Deborah and her friends saw Sanchez sitting at a bus stop. They reported this to the police and continued to the hospital. At the hospital, Deborah picked Sanchez' picture out of a group of four.

Officer Vallavazo went to where he had been told the suspect might be. Sanchez fit the description of the suspect. Vallavazo stopped him about a

block away from the bus stop. Sanchez agreed to go with the officer to the Imperial Beach police station. Officer Handley talked to Sanchez in the booking room. He took photographs of Sanchez and showed them to the victim at the hospital. He returned about 12:15 p.m. that day and found Sanchez in the holding cell. Handley told Sanchez the victim had identified him, placed Sanchez under arrest and advised him of his constitutional rights. Sanchez said he understood them and told Handley he did not want to make any statement.

Handley told Sanchez he was going to take him to the hospital.[1] During the ride to the hospital, Sanchez began to talk. He said he recently finished serving a term of 17 years in prison. Handley asked what Sanchez had done to get 17 years. That was the only question asked by either of the officers during the drive. Sanchez described his institutional history, including long terms in prisons, years in solitary confinement and a record of violence and psychiatric and medical treatment. Handley took notes and hoped Sanchez would make incriminating statements. In fact Sanchez, referring to this incident, volunteered he had done it, he did not want to hurt the victim, he only wanted sex, he was inexperienced with women and he had not been taught how to act around women. Handley did not make any comments nor ask any questions in response to these statements.

Handley stayed with Sanchez during the exam. The physician, Dr. Racek, examined Sanchez and asked "What's your story?" Sanchez stated he did not want to make any statements and Racek asked Sanchez "You don't have anything to say?" Sanchez replied "No." Racek then asked Handley "Has he told you?" Handley told Racek Sanchez had not waived his *Miranda* rights. Racek then asked "So you have nothing to say, Mr. Sanchez?" Sanchez said "Well, I did it" and Racek asked "In the bathroom?" Sanchez said "Yeah. I want to say, though, that I asked for help." Racek asked "Did she hurt you at all?" Sanchez said "No," and then told Handley "Hey, I waive my rights." Handley asked "Are you sure?" Sanchez replied "Yeah." Then Handley said "Let's wait until after the exam."

The examination was completed a few minutes after 1 p.m. and Handley took Sanchez to the coffee lounge outside the emergency room. Handley asked Sanchez if he could answer some questions and Sanchez replied "Yes." Handley advised Sanchez of his constitutional rights and told him his earlier statements were probably inadmissible in court but that anything he said now would be used against him. Sanchez then made a statement

---

[1]The City of Imperial Beach Police Department had a contract with Chula Vista Hospital to examine rape victims and suspects for physical evidence. Handley did not talk to the examining doctor before this visit, but the hospital staff was advised Sanchez would be coming for an examination.

concerning his activities and the rape. Handley took Sanchez to the county jail.

Discussion

I

Sanchez confessed three times: in the police car on the way to the hospital, to the doctor during the examination, and to the officer in the coffee room at the hospital. The trial court sustained objections to the statements made in the police car and the statements to the doctor. The court permitted the introduction of the statements made in the coffee shop. ■ When the facts are not in dispute, we are not bound by the trial court's conclusion. (*People* v. *Braeseke* (1979) 25 Cal.3d 691 [159 Cal.Rptr. 684, 602 P.2d 384].) The facts surrounding Sanchez' statements to the police and the doctor are not in dispute. Sanchez' defense at trial was not related to admissions made during the confessions but was entirely directed at whether penetration had occurred during the rape.

■ The general rules are: The improper admission of a confession obtained in violation of constitutional guarantees results in a per se reversal. (*People* v. *Powell* (1967) 67 Cal.2d 32, 52 [59 Cal.Rptr. 817, 429 P.2d 137].) The prosecution has the burden to establish Sanchez' statements were voluntary. (*People* v. *Jimenez* (1978) 21 Cal.3d 595, 609 [147 Cal.Rptr. 172, 580 P.2d 672].) Once a defendant asserts his right to remain silent, further interrogation must cease. (*People* v. *McClary* (1977) 20 Cal.3d 218, 226 [142 Cal.Rptr. 163, 571 P.2d 620]; *Edwards* v. *Arizona* (1981) 451 U.S. 477 [68 L.Ed.2d 378, 101 S.Ct. 1880].) Statements must be voluntary and any waiver must be knowingly and intelligently made. (*Edwards, supra,* at pp. 486-487 [68 L.Ed.2d at p. 387].) However, even though a suspect has once asserted his constitutional rights, he retains the option of initiating a confession. (*People* v. *McClary, supra,* 20 Cal.3d 218.) We examine the undisputed facts and determine whether the statements were voluntary. (*People* v. *Sanchez* (1969) 70 Cal.2d 562 [75 Cal.Rptr. 642, 451 P.2d 74].)

A.

■ If Sanchez invoked his *Miranda* right to remain silent or to request an attorney, he could not be subjected to a new course of interrogation even if properly readvised but he is not precluded from voluntarily reinitiating the interview. (*People* v. *Pettingill* (1978) 21 Cal.3d 231 [145 Cal.Rptr. 861, 578 P.2d 108].) Enroute to the hospital Sanchez began talking to the officers. Sanchez testified, at the hearing to determine the admissibility of this evidence, his purpose for talking to the officers was to convince the

officers he was cooperative in order to obtain more favorable treatment at the jail. Sanchez made these statements without being asked anything except "What for?" in response to his comment he had just done 17 years. There was no attempt to keep Sanchez talking or to encourage him to talk. The conversation in the police car was essentially a monologue. However, in an overabundance of caution, the trial court excluded the statements made in the car.[2]

## B.

■ Sanchez correctly asserts a doctor interviewing a defendant to secure evidence on behalf of the prosecution is an agent of law enforcement. (*People* v. *Walker* (1972) 29 Cal.App.3d 448, 453[105 Cal.Rptr. 672]; *Estelle* v. *Smith* (1981) 451 U.S. 454 [68 L.Ed.2d 359, 101 S.Ct. 1866].) The trial court finding Racek was an agent of the police is supported by substantial evidence. There was a contract between the hospital and the police, by which the hospital agreed to examine suspects and victims in rape cases. The contract had the express purpose of obtaining incriminating evidence from either the rape victim or the rape suspect.

Racek did not have the same legal status as the department store security officers in *In re Deborah C.* (1981) 30 Cal.3d 125, 131 [177 Cal.Rptr. 852, 635 P.2d 446]. In *Deborah C.* the private security officer was not acting under any arrangement with the authorities. In *People* v. *Salinas* (1982) 131 Cal.App.3d 925, 937 [182 Cal.Rptr. 683], a doctor in a hospital emergency room asked the defendant questions while obtaining a medical history as part of standard hospital procedure. *Miranda* warnings were not necessary because the doctor had no intent to provide information to law enforcement officers and was not an agent. In *People* v. *Coblentz* (1981) 123 Cal.App.3d 477, 479-480 [176 Cal.Rptr. 516], a private polygraph operator hired by the company questioned a security officer for the company; both were acting for the private purposes of their employer.

We are concerned about Racek's questioning because it is undenied that when Sanchez invoked his *Miranda* rights at the station before the voluntary statements made in the police car, he says he also asked for an attorney. This invocation of the right to counsel brought into play the "per se" aspect of *Miranda.* (*Fare* v. *Michael C.* (1979) 442 U.S. 707, 718-719 [61 L.Ed.2d 197, 208, 99 S.Ct. 2560, 2568-2569.) ■ This is the "rigid rule that an accused's request for an attorney is per se an invocation of his Fifth

---

[2]Perhaps the court excluded the statements because the one question had been asked or because Handley later told Sanchez those statements would not be used against him. In either case the statements were admissible because the statements were not the product of police interrogation or in response to any police activity.

Amendment rights requiring that all interrogation cease." (*Id.*, at p. 719 [61 L.Ed.2d at p. 209].) (See *People* v. *Robertson* (1982) 33 Cal.3d 21, 40 [188 Cal.Rptr. 77, 655 P.2d 279].) ■ Handley could have prevented Racek's improper interrogation and, in fact, he warned Racek Sanchez had not waived his *Miranda* rights. Racek did not know Sanchez had made incriminating statements in the car. Interrogation by an agent of the police while conducting a physical exam of the suspect, especially when the agent knows *Miranda* rights are not waived, is improper interrogation. The trial court properly excluded this evidence.

## C.

■ The trial court found there was no evidence the officer exerted pressure on Sanchez to get him to make the statements he made during the conversation in the coffee shop. Considering Sanchez had already voluntarily initiated an incriminating conversation with Handley in the police car, it was reasonable for Handley to readmonish Sanchez and inquire whether he had changed his mind about making a statement. It is obvious from the record Sanchez is an intelligent man, he was sophisticated on the legal issues surrounding *Miranda* warnings, he understood his rights, and for reasons of his own in order to secure more favorable treatment during his incarceration, he waived his rights. Even though Sanchez' confession in the coffee room was made after an improper interrogation in the examination room he had already told Handley more than he disclosed to Racek. Within less than half an hour from the voluntary disclosures in the police car he again told Handley the circumstances of the offense. There is no evidence the coffee room conversation was the product of Racek's interrogation on either a "cat out of the bag" theory or in response to improper force or coercion.[3]

## II

■ Sanchez argues the trial court erred in refusing to instruct the jury concerning the sufficiency of circumstantial evidence. He says the trial court

---

[3]Sanchez makes much of the officer's use of physical restraints in taking Sanchez to the hospital. Handley weighed approximately 145 pounds, Sanchez weighed 230 or 240 pounds with a large strong physical build. Handley thought he would have to take Sanchez to the hospital alone. Sanchez had inquired what would happen if he refused to cooperate and Handley warned Sanchez he was armed with a sap. Under these circumstances we cannot find leg chains and handcuffs unreasonable restraint and nowhere in the record does Sanchez assert he was in any way intimidated by the officer's conduct.

was required to give CALJIC No. 2.01.[4] The witness' testimony was direct evidence the penis entered the vagina "just a little bit." The witness was asked "About how much if you can estimate?" Her answer was "A quarter of an inch; that's a guess." It is Sanchez' argument this evidence is weak and it is entirely possible the victim was penetrated by something other than the penis. This argument was answered in *People* v. *Thomas* (1979) 87 Cal.App.3d 1014 [151 Cal.Rptr. 483]; there, the court pointed out that when prosecution evidence is primarily direct evidence and circumstantial evidence is simply corroborative, CALJIC No. 2.01 need not be given. The witness' testimony here was direct evidence, evidence which directly proved the act without resort to inference or presumption. The characterization of evidence as direct does not depend upon its strength or weakness. (See *People* v. *Thomas, supra,* at pp. 1019-1020.) Thus, there was no error in the refusal to give CALJIC No. 2.01.

## III

■ The prosecutor did not engage in misconduct. The general test for the determination of prosecutorial misconduct is found in *People* v. *Strickland* (1974) 11 Cal.3d 946, 955 [114 Cal.Rptr. 632, 523 P.2d 672]. We have examined the arguments made by the prosecutor and find no impropriety in commenting that the victim might have become anxious because of the length of the time between the crime and the trial. And the prosecutor's aside, in which he asks if it is any wonder women do not report all the rapes that happen, while perhaps inappropriate, does not approach prosecutorial misconduct requiring reversal. No misconduct is found and it is not reasonably probable a result more favorable to the defendant would have occurred had the district attorney refrained from the comments attacked by the defendant.

---

[4]CALJIC No. 2.01 reads: "However, a finding of guilt as to any crime may not be based on circumstantial evidence unless the proved circumstances are not only (1) consistent with the theory that the defendant is guilty of the crime, but (2) cannot be reconciled with any other rational conclusion.

"Further, each fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt must be proved beyond a reasonable doubt. In other words, before an inference essential to establish guilt may be found to have been proved beyond a reasonable doubt, each fact or circumstance upon which such inference necessarily rests must be proved beyond a reasonable doubt.

"Also, if the circumstantial evidence [as to any particular count] is susceptible of two reasonable interpretations, one of which points to the defendant's guilt and the other to his innocence, it is your duty to adopt that interpretation which points to the defendant's innocence, and reject that interpretation which points to his guilt.

"If, on the other hand, one interpretation of such evidence appears to you to be reasonable and the other interpretation to be unreasonable, it would be your duty to accept the reasonable interpretation and to reject the unreasonable."

Judgment affirmed.

Cologne, Acting P. J., and Lewis, J.,* concurred.

A petition for a rehearing was denied October 20, 1983, and appellant's petition for a hearing by the Supreme Court was denied December 22, 1983.

---

*Assigned by the Chairperson of the Judicial Council.