Filed 12/27/22 P. v. Sanchez CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. MIGUEL SANCHEZ, Defendant and Appellant. | B316392 (Los Angeles County Super. Ct. No. VA153941) |

APPEAL from a judgment of the Superior Court of the County of Los Angeles, Raul Anthony Sahagun, Judge. Affirmed.

Randy S. Kravis, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Scott A. Taryle and Blythe J. Leszkay, Deputy Attorneys General, for Plaintiff and Respondent.

# I.    INTRODUCTION

The jury found defendant Miguel Sanchez guilty on multiple counts of committing lewd acts on a child and one count of sexual penetration of a minor under the age of ten.  On appeal, he contends that the trial court abused its discretion by excluding statements from the victims' mother about one victim's character for truth and veracity.  He also contends he received ineffective assistance of counsel because his trial attorney failed to challenge the introduction of a recorded conversation during which he made incriminating admissions.  We affirm.

# II.    FACTUAL BACKGROUND

A.    *Prosecution's Evidence*

### 1.    Relationship of the Parties

The victims, Catherine and her younger half-sister, Briana,[1] have the same mother (mother).  Between 2005 and 2015, Susana, a close family friend, provided childcare for mother's children, including Catherine and Briana, after school, Monday through Friday.  Susana lived with defendant across the street from the girls' grandmother, with whom the girls often lived or stayed.

---

[1]    Catherine was born in 1999 and Briana was born in 2004.

## 2.    Abuse of Catherine

On one occasion between December 14, 2005, and December 13, 2006, when Catherine was six years old, Susana told her to go into the bedroom Susana shared with defendant and explain to him the after-school reading assignment she had completed that day.  Catherine sat on a ladder next to the bed on which defendant was laying and explained what she had read.  Defendant massaged Catherine's genital area, which made her feel uncomfortable.  During that same time period, a few times each month, defendant rubbed her genital area both over her clothes and inside her underwear.  He also digitally penetrated her vagina.

Between December 14, 2006, and December 2010, from the time Catherine was six until she was ten years old, defendant regularly abused her in a similar manner.  Defendant's inappropriate conduct with Catherine ended when she turned 11 and started middle school.  At that point, Susana stopped providing care for Catherine because she could walk home from school with her brother and cousin.

From the time she was six until she turned 11, Catherine did not tell anyone about defendant's conduct.  At the time, she "didn't know what was happening to [her] shouldn't be happening."  She did not understand that his conduct was abnormal.

## 3.    Abuse of Briana

From May 13, 2008, to May 12, 2015, when Briana was between four and ten years old, she would be at Susana's home

regularly for childcare. Sometimes she would be there without Catherine.

According to Briana, on one occasion, when she was about four years old, defendant began to kiss her genital area. He then pulled down her pants and orally copulated her. Defendant told Briana, who was toilet trained, "that he was making sure . . . that [she] was cleaning [her]self right." Defendant orally copulated her around three times a week.

Briana testified that during the time period that she was at Susana's home for childcare, defendant would use his hands to rub her vagina and digitally penetrate her. He also kissed and licked her anus. On one occasion, defendant picked up Briana from school and orally copulated her and digitally penetrated her vagina.

Defendant's inappropriate touching "happened less as [she] got older" and, after she turned 11 and no longer went to childcare at Susana's home, it "fully stopped." Briana did not tell anyone about defendant's conduct during the years it was occurring because she was "little . . . [and] didn't really realize what was happening[;] . . . it kind of became normal to [her]."

4.    The Victims' Disclosure of Abuse

When Catherine was either 15 or 16 years old, she told Briana that defendant "had touched [her] inappropriately [and] that he would [give] her massages whenever" Susana sent her to defendant's bedroom to explain her reading assignment. In response, Briana told Catherine about "a couple of instances [with defendant] that she . . . remembered, but nothing in detail."

In 2017, Catherine heard mother tell a friend that she was considering sending Catherine's two-year-old sister to Susana for childcare. Because Catherine did not want her sister in Susana's home, she decided to tell mother what happened to her there. Briana joined Catherine in the conversation with mother about defendant's conduct with them when they were young.

Sometime in 2017, an officer from the South Gate Police Department spoke to Briana and Catherine. They did not hear anything from the police again until 2020.

5.     The Investigation

On January 21, 2020, Detective Aaron Krisman took over the investigation of defendant's molestation of Catherine and Briana. He called mother and made an appointment for them to meet with him at the South Gate Police Department. The detective subsequently met with Briana and mother, each of whom provided more detailed statements about the incidents with defendant. On March 10, 2020, Detective Krisman met with Catherine and conducted a more detailed follow-up interview with her.

Following his interviews with mother and the victims, Detective Krisman arranged for an investigation to be conducted during which Catherine, who was then 19 years old, would confront defendant about his conduct with her and Briana. He enlisted the assistance of three other officers and planned to have Catherine wear a device to record her conversation with defendant. Using his cell phone, the detective could then listen to the confrontation between defendant and Catherine.

5

On August 4, 2020, Catherine met with Detective Krisman "about possibly . . . confronting . . . defendant about what happened to [her]." There were other officers present at the meeting and she understood that their role would be to observe her confrontation with defendant from a distance. Detective Krisman gave Catherine a device to record her conversation with defendant. He explained how the device worked, but did not give her any further instructions, other than to warn her not to be alone with defendant.

That day, Catherine rode with the detective to the parking lot of the supermarket next to Susana's house. From there, she walked to the house "to ask for [defendant], saying that [she] had car trouble[] and . . . need[ed] help." She spoke with Susana who explained defendant "was probably sleeping" and recommended a mechanic down the street.

Catherine then went back to Detective Krisman's car in the supermarket parking lot. While waiting in his car, she received a call and text from her brother saying that Susana and defendant had been to her grandmother's house looking for her. She exited the car and encountered defendant near the side of the supermarket where they engaged in a recorded conversation while moving toward the front of the supermarket. Following her conversation with defendant, Catherine returned to Detective Krisman's car, gave him the recording device, and rode home with him.

6.  Recorded Conversation with Catherine

During the recorded encounter between Catherine and defendant, the parties engaged in the following conversation: At

6

the beginning of the encounter, Susana was present, but as defendant and Catherine began to walk, she stayed behind. Following a brief exchange about Catherine's pretextual car trouble, Catherine told defendant that she wanted to speak with him "about what happened when [she] was younger." She then asked, "You know what I'm talking about?" Defendant responded, "Yeah, I know." As Catherine began to specify, saying, "You put your hand down my pants—" defendant interrupted, "I know. I'm sorry. I know." Catherine finished, "—in my pants, in my underwear" and defendant again apologized, "So sorry, Cathy."

At that point, defendant wanted to move to a different location, and Catherine agreed, but indicated that they were "just gonna go walking in front of people." Catherine told defendant she did not "feel bad" for him, to which he again responded apologetically, "Okay. Sorry, Cathy. Okay?" Catherine told him that his conduct was not something that he "could just brush off" or that could "just be forgotten like that. It's something super serious, and it's something that's impacted my life since it happened." Defendant replied, "Oh, I'm sorry. Sorry, Cathy."

When Catherine disclosed that she also knew what defendant did to Briana, defendant initially denied doing anything to her. Catherine reiterated, "You did it to my sister," but defendant disagreed, explaining, "No, I [¶] . . . [¶] play with her only."

Catherine returned the topic to defendant's abuse of her, telling him, "You put your hand in my pants, in my underwear multiple times. You touched my vagina." Defendant acknowledged, "I feel—I know. I feel . . . ." When she demanded that he "look [her] in the face," defendant, apparently referring to

7

the abuse, said, "[I]t's over Cathy," causing her to renew her demand that he look her in the face and remind him that it was "not over . . ." because she thought about "it constantly."

Catherine then changed the subject back to defendant's abuse of Briana, detailing that he took her out of school several times.  She stated, "you put your mouth on her.  Correct?"  Defendant responded, "I—no.  I'm playing—I'm playing."  His response prompted Catherine to ask whether he thought his abuse of Briana was "playing," and he replied, "I know.  I know—you know, right now, why you (Inaudible) long time now."  Catherine emphasized that she "need[ed] answers" and cautioned that if defendant did not "give [her] answers, [she would go] to the police with this."  Defendant said, "No," and Catherine repeated that she needed answers.  At that point, defendant said, "Okay.  I said sorry if I did, okay?  Sorry, Cathy."  Catherine told defendant, "You did it."  Defendant responded, "No, Cathy."

Asked why he was apologizing if he did not do anything wrong, defendant offered another apology:  [I]f I— I—if I did it, then I do—I'm sorry I did—I'm sorry.  I didn't do nothing more to nobody, Cathy."

Catherine next pressed defendant on whether he thought "what [he] did [was] okay,'" and he conceded, "No, it's not okay."  She then asked why he did it, and he explained, "Because you know . . . , Cathy, I feel like a something bad—that was bad for me right now.  I feel like I did do it to you.  Sorry, Cathy.  Sorry.  I feel—I feel bad."  When Catherine replied that his response did not change the way she felt, defendant asked, "I know I was—what can I do it, now?"

At that point, Catherine confronted defendant about the offensive comment he made to her "years later"—that she looked

8

prettier when she was younger—and asked if he realized "how sick that sound[ed]" and "[h]ow disgusting that made [her] feel." Defendant once again apologized, "I know. Sorry, Cathy. Sorry, Cathy."

When Catherine turned the subject back to his abuse of Briana, defendant asked, "So what can I do right now, Cathy." Catherine answered that she hoped he "realize[d] . . . the effect that [he had] on people," but defendant said only, "I don't know." Catherine then informed defendant that Briana was now 16 years old with a child of her own, a circumstance for which Catherine blamed defendant.

Defendant wanted to move the conversation to a different location, but Catherine responded that she was there to confront him about his conduct and that she needed answers. Defendant reiterated that he did not do a "bad thing" to Briana, causing Catherine to ask if he was going to "lie to [her] face after what [he had] done to [her?]" Defendant replied, "Okay. I do it bad. Sorry." Catherine repeated that defendant had done "something to [Briana]" and "something to [her]," admonishing him not to "lie to [her] face." Defendant complained that Catherine was not being fair, but Catherine reminded him that he "did what [he] did." Defendant acknowledged, "Yeah, I know. Trust me. I know."

Catherine queried whether defendant thought that there would be no consequences for his actions and that he could avoid being confronted about them. Defendant responded that he "already . . . spent years and [he thought] it, and [he was not] doing nothing bad . . . . [I]f [he did] it, [he did] it, and [he was] sorry . . . ."

Catherine informed defendant that his apologies would not make her stop thinking about his abuse, advising again that if she did not get the answers she needed, she would go to the police. She then demanded to know why defendant thought it was "okay to do that to little girls" and why a 50-something-year-old man would "be touching [someone] . . . under 10 years old." Defendant affirmed, "Yes Cathy. I know. I know." When Catherine reiterated his misconduct, defendant pleaded with her to "just stop. Stop being like that." But Catherine persisted, explaining that she was confronting him about the abuse because "it play[ed] in [her] mind" and inquiring whether he wanted her to "[j]ust forget it?" Defendant then asked, "Why [did] you not tell . . . [me to] just stop, stop[?]" Catherine responded that she did tell him to stop and that her sister was too young to "even know what [his abuse] meant," in reply to which defendant said, "Yeah, I know."

Catherine expressed her hope that "the Lord [would have] mercy on [defendant's] soul" and told him that "if [the Lord did not, defendant was] going to a very dark, bad place." Defendant confirmed, "I know."

As defendant and Catherine began walking, and in response to Catherine's renewed reference to his conduct with her and Briana, defendant confided that he did not want Susana "to find out what [he] did." Catherine replied that defendant "did what [he] did," that he would "have to live with [it]," and that she did not "owe [him] anything."

Defendant asked "what [he could] do," and Catherine told him he needed to "[l]ook [her] in the eyes right now" and "admit it." Defendant again told Catherine, "[I]f [he did] something bad to [her] . . . [he was] sorry," prompting Catherine to admonish

10

him to "[s]top saying 'if,' because [he] did do something bad to [her]." Asked again by defendant what he could do, Catherine directed defendant to, "[s]ay it. Look [her] in the eyes and tell [her] . . . ." After a further exchange, defendant conceded, "Okay. I did it. You . . . hear me?" Catherine then pressed defendant to also "admit what [he] did to [Briana] now," but he equivocated.

Catherine brought up defendant's statement about her being "prettier when [she] was younger," but defendant claimed he did not remember making the statement. After a further exchange on that issue, Catherine demanded that defendant "look [her] in the face and say that [he] did [it]." Following more exchanges, Catherine explained that she was "just trying to get closure so that [she did not need to] go to the [police]." Defendant again conceded, "I did this, okay." Catherine replied, "Okay. And Briana? But defendant claimed he did not remember, saying he was just "playing . . . ."

Catherine and defendant had a further colloquy about Briana, including his purported lack of memory, and Catherine then informed him that his abuse of her "still fuck[ed] her up to this day" and that he also "fucked Briana up so bad. She was so little . . . ." Catherine warned defendant not to talk to or go near Briana.

Catherine advised defendant one last time that he needed to admit the abuse, that she needed closure, and that he was sick and in need of help. Defendant acknowledged, "I know—I know." When he promised to seek help, Catherine told him that she did not care what he did and ended the conversation.

11

B.    *Defense Evidence*

1.    Defendant's Testimony

Between 2005 and 2015, defendant lived in a home with Susana where she would provide childcare.  Due to work, defendant was not always home when Catherine and Briana were there.  When he was home, he would sometimes watch the children in Susana's care as they played in the front yard.

Defendant denied ever touching Catherine inappropriately.  He also denied ever touching Briana inappropriately.  According to defendant, none of the accusations made by Catherine or Briana were true.

When Catherine confronted defendant at the supermarket, her demeanor was "very aggressive."  She spoke to him like she had never spoken to him before, "like she had never seen [him] . . . ."  She "was moving her hands a lot" and "saying things that [he] didn't understand."

Catherine initially talked to him about her car, and he "had [his] tools to go and help her."  But "then she started . . . to make some other conversation" and he "felt bad . . . because of [his] neighbors . . . ."  He knew "quite a few people" who lived on the street near the supermarket.  His friends and neighbors shopped at the market.

During the conversation, defendant "felt sad" and "didn't understand the things that [Catherine] was telling [him]."  It was the first time she had ever accused him of inappropriate behavior.

Defendant explained that he initially apologized to Catherine because, on the occasions when he would help Susana

12

with the children in her care, he spent more time playing with the boys than the girls. He also apologized because he "didn't have words to respond with" and because she was making a scene and he "just wanted her to leave." But none of her accusations during the conversation were true.

Defendant also claimed that he apologized to Catherine because he was confused due to a brain injury he had previously sustained at work. He could not understand why she was accusing him. He loved Catherine and Briana because they did not have a father.

Defendant denied ever telling Catherine that she looked prettier when she was younger. He also explained that he told Catherine he was playing in response to her accusations because sometimes he would play with the children on the grass and "push them." When asked if he ever did anything to Catherine or Briana that might cause them to accuse him of sexual abuse, defendant explained that he "didn't take them out to play."

2.     Susana's Testimony

Between 2005 and 2015, Susana cared for Catherine and Briana in her home. Defendant was not always home when Susana was taking care of the girls. He sometimes spent a few months in Mexico.

When he was home, defendant would occasionally help the children with reading in the living room or take them outside to play. On "rare occasions," defendant would help the children with their reading in the bedroom, but Susana would be "watching." Susana never observed defendant touching any of the children inappropriately, including either Catherine or

13

Briana.  And, she never saw either girl acting uncomfortably or observed their behavior change after defendant helped them with their homework.

## III.   PROCEDURAL BACKGROUND

In an information, the Los Angeles County District Attorney charged defendant with six counts of committing a lewd act on Catherine in violation of Penal Code section 288, subdivision (a);[2] four counts of oral copulation or sexual penetration of Catherine in violation of section 288.7, subdivision (b); eight counts of committing a lewd act on Briana in violation of section 288, subdivision (a); and five counts of oral copulation or sexual penetration of Briana in violation of section 288.7, subdivision (b).

The jury found defendant guilty of committing:  three lewd acts on Catherine; one sexual penetration of Catherine; and one lewd act on Briana.  He was acquitted of all other charges.  The trial court sentenced defendant to 45 years to life in prison.

## IV.   DISCUSSION

A.    *Exclusion of Mother's Opinion Testimony*

Defendant contends that the trial court abused its discretion and violated his constitutional right to a defense when it excluded certain statements mother made to the police about Briana's veracity.  According to defendant, those statements were

---

[2]    All further statutory references are to the Penal Code unless otherwise indicated.

14

admissible under Evidence Code sections 780 and 1103 as lay opinion about about a victim's character for dishonesty made by a person qualified to offer such an opinion.

1. <u>Background</u>

The trial court and counsel had the following exchange outside the presence of the jury. Defendant's counsel asserted that mother "made several statements to officers including [that] she believes Catherine more than Briana." Apparently quoting from a police report, counsel read the following statements by mother: "'It's really hard for me to believe Briana. I believe Catherine more than Briana. Briana will lie to your face.'" According to counsel, there were three or four times in one interview where mother "said her opinion as to Briana's character for truthfulness and veracity."

The prosecutor objected to "mother's opinion in 2017 asking if in 2017 she held the opinion that she had a harder time believing Briana. I don't think it's relevant."

Defense counsel responded, "what [mother] felt and said in 2017 is absolutely relevant because based on the statements that were made in 2017, these charges were initiated, investigation was done and—and the victims are testifying to conduct that predated 2017. [¶] And it is the defense position that opinion and reputation evidence is admissible under the evidence code to prove a character trait for honesty." Defense counsel then cited Evidence Code section 1101, subdivisions (a) and (c) in support.

The trial court responded, "Well, in essence, it seems to me that that testimony is being—the relevance of the testimony is that she's gonna say I think my daughter is a liar and she's hard

15

to believe and I don't believe that she's telling the truth.  That testimony, I think, is inadmissible . . . .  [¶]  . . .  [¶]  So the . . . motion to exclude that statement, her opinion that Briana is a liar, that Briana's testimony is false, that Briana cannot be believed, should not be believed, she has a tough time believing it, is granted and it's excluded."

   2.   Legal Principles

"Lay opinion about the veracity of particular statements by another is inadmissible on that issue.  . . . [T]he reasons are several.  With limited exceptions, the fact finder, not the witnesses, must draw the ultimate inferences from the evidence.  Qualified experts may express opinions on issues beyond common understanding (Evid. Code, §§ 702, 801, 805), but lay views on veracity do not meet the standards for admission of expert testimony.  A lay witness is occasionally permitted to express an ultimate opinion based on his perception, but only where 'helpful to a clear understanding of his testimony' (*id.*, § 800, subd. (b)), i.e., where the concrete observations on which the opinion is based cannot otherwise be conveyed.  [Citations.]  Finally, a lay opinion about the veracity of particular statements does not constitute properly founded character or reputation evidence (Evid. Code, 780, subd. (e)), nor does it bear on any of the other matters listed by statute as most commonly affecting credibility (*id.*, § 780, subds. (a)-(k))."  (*People v. Melton* (1988) 44 Cal.3d 713, 744.)

An individual who has known a witness for a reasonable period of time, however, may "'qualify to testify as to the witness' character for honesty or veracity.'"  (*People v. Bell* (2019) 7

Cal.5th 70, 107.) "Evidence of a witness's character for truthfulness, or its opposite, is relevant to credibility and admissible for this purpose. (Evid. Code, § 780, subd. (e).) This evidence may be shown by '(a) evidence of specific instances of conduct, (b) opinion evidence, or (c) reputation evidence.' [Citation.]" (*Id*. at p. 106.)

A trial court's decision on whether to admit lay opinion testimony is reviewed for abuse of discretion. (*People v. DeHoyos* (2013) 57 Cal.4th 79, 132.)

### 3. Analysis

We will assume, without deciding, that mother's comments constituted her opinion about Briana's character for truth and veracity and were therefore admissible to impeach Briana's credibility. Nevertheless, we conclude that defendant was not prejudiced by the exclusion of those comments.[3]

Of the 13 counts involving Briana,[4] the jury found defendant guilty on only a single count of committing a lewd act

---

[3] Because the trial court's exclusion of mother's comments implicates error under state law, defendant must show that a different result was reasonably probable under the prejudice standard articulated in *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*). (*People v. Gonzalez* (2018) 5 Cal.5th 186, 201.)

[4] Defendant asserts that the exclusion of mother's comments about Briana's veracity prejudiced him as to the counts involving Catherine, as well as on the one count involving Briana. But mother's comments included her opinion that she believed Catherine more than she believed Briana. Thus, even if the comments were admitted, they would not have had a tendency in

17

on a child.  The evidence in support of that finding was strong.  (*People v. Moye* (2008) 47 Cal.4th 537, 556 [in evaluating prejudice under *Watson*, "'an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result'"].)  In the recorded confrontation with Catherine, defendant not only admitted to abusing Catherine, he also made statements that could be reasonably construed as admissions about and apologies for his abuse of Briana.  In addition, defendant continually apologized to Catherine, or acknowledged, "I know," in response to her accusations of abuse, including her repeated accusations that he abused Briana.  And, although defendant denied abusing either victim during direct examination, on cross-examination, he was unable to provide any plausible explanation for his repeated admissions and apologies to Catherine during the confrontation.

Given the totality of the evidence against defendant, it was not reasonably probable that introduction of mother's opinion about Briana's veracity would have persuaded the jury to return a more favorable verdict on the one count of committing a lewd act on Briana.  Accordingly, any error in excluding the evidence was harmless.  (*Watson, supra*, 46 Cal.2d at p. 836.)

---

reason to impugn Catherine's credibility concerning the counts involving her.

B.  *Ineffective Assistance*

Defendant contends that he received ineffective assistance of counsel because his trial attorney failed to make a due process challenge to the admission of the recorded confrontation between him and Catherine outside the supermarket.  According to defendant, such a challenge would have been successful because Catherine was acting as an agent of the state when she coerced his admissions using "implied threats and promises of leniency."

1.  Legal Principles

To establish ineffective assistance of counsel on appeal, a defendant must show that defense counsel's performance was deficient and prejudicial—i.e., that there was a reasonable probability that there would have been a different outcome absent counsel's deficient performance.  (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)  A reviewing court may resolve an ineffective assistance claim by deciding only the question of prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 697 (*Strickland*) ["If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed"].)

2.  Analysis

Under the due process clause, a statement that is obtained as a result of coercive police activity is inadmissible.  (*People v. Massie* (1998) 19 Cal.4th 550, 576.)  Defendant's ineffective assistance claim therefore is premised on his assertion that a

challenge to the admission of the recording on due process grounds would have been successful because Catherine was acting as a state agent.

In *In re Neely* (1993) 6 Cal.4th 901 (*Neely*)—a case decided under the Sixth Amendment right to counsel as construed in *Massiah v. United States* (1964) 377 U.S. 201 (*Massiah*) and its progeny—our Supreme Court explained that in order to prevail on a *Massiah* claim based on a violation involving an informant, "the evidence must establish that the informant . . . was acting as a government agent, i.e., under the direction of the government pursuant to a preexisting arrangement, with the expectation of some resulting benefit or advantage . . . ." (*Neely, supra*, 6 Cal.4th at p. 915.) The court observed that an informant would not qualify as a government agent if "law enforcement officials merely accept information elicited by the informant-inmate on his or her own initiative, with no official promises, encouragement, or guidance. [Citation.] In order for there to be a preexisting arrangement, however, it need not be explicit or formal, but may be 'inferred from evidence that the parties behaved as though there were an agreement between them, following a particular course of conduct' over a period of time. [Citation.] Circumstances probative of an agency relationship include the government's having directed the informant to focus upon a specific person, such as a cellmate, or having instructed the informant as to the specific type of information sought by the government. [Citation.]" (*Ibid*.)

Here, there are no facts that support an inference that Catherine acted as a government agent when she wore a recording device and confronted defendant. Detective Krisman did not exercise control over Catherine's questioning of defendant

20

during the confrontation and there is no evidence that he instructed her on what questions to ask defendant or what type of information to elicit.  (*See People v. Martin* (2002) 98 Cal.App.4th 408, 419–420.)  Nor was there any evidence that Catherine had a preexisting relationship or agreement with the police (compare *People v. Sanchez* (1983) 148 Cal.App.3d 62, 69) or that there was any "express or implied *quid pro quo* underlying the relationship" (*United States v. Taylor* (10th Cir. 1086) 800 F.2d 1012, 1016).  At most, the only benefit that Catherine sought in speaking with defendant was to demonstrate that he had sexually abused her.  This, however, is not the type of "benefit or advantage" that renders a private citizen a government agent.  (See *Coolidge v. New Hampshire* (1971) 403 U.S. 443, 487 ["[I]t is no part of the policy underlying the Fourth and Fourteenth Amendment to discourage citizens from aiding to the utmost of their ability in the apprehension of criminals"].)

We therefore conclude that defendant failed to carry his burden of showing prejudice.  Because defendant could not show that Catherine was acting as a government agent, there was no Fourteenth Amendment basis upon which to support an argument that an agent of the state coerced defendant's confession.  Accordingly, a motion to exclude his recorded statements would have been unsuccessful.

21

## V.    DISPOSITION

The judgment of conviction is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


KIM, J.


We concur:


RUBIN, P. J.


BAKER, J.