Filed 3/25/19 (unmodified opn. attached)

<u>**CERTIFIED FOR PARTIAL PUBLICATION**</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>EDUARDO OROZCO,<br><br>    Defendant and Appellant. | B288942<br><br>(Los Angeles County<br>Super. Ct. No. VA130104)<br><br>ORDER MODIFYING OPINION<br><br>NO CHANGE IN JUDGMENT |

THE COURT:*

It is ordered that the opinion filed herein on February 28, 2019, be modified as follows:

1. At the bottom of page 5, where it reads:  The autopsy, he reported, showed that Mia had "died at the hands of another," replace as follows:

> The autopsy, he reported, showed that Mia had "died at the hands of [an]other,"

There is no change in the judgment.

Filed 3/7/19 (unmodified opn. attached)
**CERTIFIED FOR PARTIAL PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO


| THE PEOPLE, | B288942 |
| --- | --- |
|     Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. VA130104) |
|     v. | |
| EDUARDO OROZCO, | ORDER MODIFYING OPINION AND DENYING REHEARING |
|     Defendant and Appellant. | NO CHANGE IN JUDGMENT |


THE COURT:*

It is ordered that the opinion filed herein on February 28, 2019, be modified as follows:

1. On page 2, second paragraph, line 5, where it reads, "the day before", replace as follows:

> earlier the same day

2. On page 9, footnote 3, where it reads, "Because defendant 'points to no evidence in the record supporting his inability to

pay' (*People v. Gamache* (2010) 48 Cal.4th 347, 409), and hence no evidence that he would suffer any consequence for non-payment, a remand would serve no purpose." replace as follows:

> Because there is "no evidence in the record supporting his inability to pay" (*People v. Gamache* (2010) 48 Cal.4th 347, 409), and hence no evidence that he would suffer any consequence for non-payment, a remand for further fact-finding would serve no purpose."

There is no change in the judgment.

Appellant's petition for rehearing is denied.

_____
\* LUI, P. J.,        CHAVEZ, J.,        HOFFSTADT, J.

Filed 2/28/19 (unmodified version)

**CERTIFIED FOR PARTIAL PUBLICATION\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B288942 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. VA130104) |
| v. | |
| EDUARDO OROZCO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  John A. Torribio, Judge.  Affirmed.

Brad Kaiserman, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Zee Rodriguez, Supervising Deputy Attorney General, and Daniel C. Chang, Deputy Attorney General, for Plaintiff and Respondent.

_____

\*      Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of footnote 3.

\* \* \* \* \* \*

While watching his six-month-old daughter by himself one evening, a man struck her so hard that he killed her. He confessed to doing so while meeting privately with the child's mother in a police interview room, and the trial court admitted the confession at trial. That meeting, however, was orchestrated by police and occurred just hours after defendant had been questioned by police, had proffered an innocent explanation for the infant's death, and had thereafter repeatedly asked for a lawyer. This appeal presents three questions bearing on the admissibility of confessions in criminal cases: (1) Does a suspect's invocation of his right to counsel under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*) preclude the admission of a confession a suspect subsequently makes to a person he is unaware is functioning as an agent of law enforcement, (2) Does continued questioning of a suspect after invocation of the *Miranda* right to counsel automatically taint any subsequent confession, and (3) Does the above described law enforcement conduct otherwise violate due process? We conclude that the answer to all three questions is "no," and affirm the trial court's ruling admitting his confession.

## FACTS AND PROCEDURAL BACKGROUND

### I.     Facts

#### A.     *Underlying crime*

Mia was a little over six months old at the time of her death. Mia died from blunt trauma. She had 29 bruises, seven rib fractures, a punctured right lung, bruised lungs, and a lacerated liver. Most of these injuries had been inflicted in the hours prior to Mia's death, as a pediatrician's appointment the day before revealed only a few bruises and no internal bleeding.

Just hours before her death, however, Mia was playing with toys and "look[ing] fine."  That was how her mother Nathaly Martinez (Martinez) last saw Mia, when she left the infant in the sole custody of her boyfriend and Mia's father, Edward Orozco (defendant).

A few hours later, defendant called Martinez to report that Mia was not breathing.  Martinez rushed back home, but Mia's body was cold to the touch and attempts at CPR by defendant, Martinez, and Martinez's relative did not resuscitate her.  Administering CPR did not inflict any of Mia's injuries.

Someone called 911, and emergency medical personnel responded.  A paramedic had to carry Mia out of the home while defendant, Martinez and other family members quarreled among themselves.

Attempts to revive Mia failed.

B.    *Subsequent interviews*

1.    *Law enforcement interrogates defendant (the first interview)*

A little before dawn the day after Mia's death, defendant voluntarily accompanied police to the police station.  He met with three officers in an interview room, and they told him he was "not in custody" and was "free to leave."  One of the officers nevertheless read defendant his *Miranda* rights, and defendant indicated that he understood them.

Defendant then proffered his account of what happened.  He said he gave Mia some baby Motrin when she was crying; that he put her in her crib; and that when he came back upstairs a few hours later to check on her, her face was up against the side of the crib and she was no longer breathing.  Defendant had no explanation for how Mia got so bruised up.

3

The interviewing officers expressed some skepticism, pointing out that defendant was "the last one with her" and pressing for an explanation of the numerous bruises on her body. However, defendant stuck to his account of what happened and said he "would never hurt [his] daughter."

An officer then asked if defendant would be "willing to sit down and repeat the story on a polygraph machine." Defendant responded by asking, "Can I have an attorney?" The officer responded, "Sure you can have an attorney," but that officer and another officer then proceeded to ask defendant at least four times, "Why would you need an attorney"? In the midst of these further questions, defendant requested an attorney four more times, all the while maintaining that his account was truthful and that he had no explanation for Mia's injuries.

At that point, one of the officers placed defendant under arrest for Mia's murder. Another officer told defendant, "[Y]ou ask[] for your attorney . . . but we're asking for your honesty." The officer then told defendant, "[i]f you're willing to talk to us right now" "[w]ithout your attorney present" "and [to] explain what happened[,] I'm not going to take you to jail." Defendant repeated his request for an attorney and the officer said, "All right. Go to jail. Done."

At that point, the interview ended. Defendant had not made any incriminating statements.

### 2. *The conversation between defendant and Martinez*

#### a. Pre-conversation

Several hours after the first interview, the police allowed defendant and Martinez to meet in an interview room at the police station. It is not clear who suggested the meeting. Before placing Martinez in the interview room, one of the police officers

told her that maybe "you can get the full explanation out of [defendant]." The officer reminded her, "You are the mother of Mia and that you ha[ve] a right to know, that you ha[ve] to know, and that you ha[ve] to know everything." The officer did not give Martinez specific questions to ask or describe the particular information to get from defendant, but Martinez felt like she had to report back to the police.

### b. First portion of conversation

The officer escorted Martinez into the interview room and immediately left, leaving Martinez alone with defendant. Their conversation was recorded.

Martinez asked defendant what happened while he was watching Mia. Defendant gave Martinez the same explanation he had previously given the police. Defendant said he was "scared," but Martinez assured him that "[she] knew" he "didn't do anything."

### c. Interruption regarding autopsy and subsequent discussion

One of the officers then entered the interview room. He said he had received a call from the coroner's office. The autopsy, he reported, showed that Mia had "died at the hands of another," that Mia "didn't suffocate," and that her bruises were caused by "a beating." The officer then told defendant, "[Y]ou were the last one with your daughter and there's [no] doubt [about] it. She suffered major injuries. This may be the last time you guys get to talk to each other in person, okay?" He stated that "right now both of you are looking at going to jail for child neglect; causing the death of that baby." He then asked, "Did either of you have anything you want to say to me?" Martinez said, "No"; defendant was silent.

The officer left the interview room.

Martinez again asked defendant, "What happened?" Defendant said he "want[ed] [the police] to leave [her] alone" and that he did not want "them to take" Martinez. Martinez again reassured him, "We're . . . going to get through this."

> d.      Officer momentarily pulls Martinez out of the room

The same officer who announced the autopsy results re-entered the room and asked Martinez to step outside. He asked if she would take a polygraph test, and informed her that defendant had refused to do so. The officer then escorted Martinez back to the interview room. The officer later admitted that his purpose in doing this was to "stimulate conversation" between Martinez and defendant.

> e.      Resumption of conversation and confession

Once they were alone again, Martinez asked defendant, "[W]hy don't [you] want to take [the] polygraph?" Martinez reminded defendant that she was "Mia's mother," that she "need[ed] to know what happened to her," and that, "If you love me, you need to tell me the truth."

Defendant at first replied that he "didn't do it," but moments later said he "did it." While sobbing, he went on to confess that he "hit her" "once" and that he "fucking killed Mia," their "little baby."

A few minutes later, the officer returned, said "Time's up," and escorted Martinez from the interview room.

6

## II.  Procedural Background

### A.  *Charges*

The People charged defendant with (1) murder (Pen. Code, § 187, subd. (a)),[1] and (2) assault on a child causing death (§ 273ab, subd. (a)).[2]

### B.  *Cross motions to suppress and admit*

Defendant filed a written motion to exclude his confession as obtained in violation of *Miranda*.  The People filed a cross-motion to admit the confession.

The trial court ruled that the confession was admissible. The court found that Martinez was an agent of the police at the time she spoke with defendant in the interview room, but ruled that "the case law"—specifically, *Illinois v. Perkins* (1990) 496 U.S. 292 (*Perkins*), *People v. Guilmette* (1991) 1 Cal.App.4th 1534 (*Guilmette*) and *People v. Plyler* (1993) 18 Cal.App.4th 535 (*Plyler*)—foreclosed defendant's argument that his prior invocation of his *Miranda* right to counsel mandated suppression because defendant had been unaware of Martinez's role as a police agent and thought he was talking to his girlfriend.  The court also rejected defendant's argument that officer's intervention to announce the autopsy results changed the analysis because the officer "just came in and then he left again."

---

1    All further statutory references are to the Penal Code unless otherwise indicated.

2    The People also alleged that defendant personally inflicted great bodily injury (§ 12022.7) regarding the murder, but later dismissed that allegation.

7

## C.    *Verdicts, sentencing and appeal*

The matter proceeded to a jury trial.  The jury convicted defendant of second degree murder and assault on a child causing death.

The trial court sentenced defendant to prison for 25 years to life on the assault count.  The court imposed, but stayed under section 654, a sentence of 15 years to life on the murder count. The court also imposed $60 in court operations assessments, $80 in criminal conviction assessments, and the minimum $300 restitution fine, and imposed but suspended a $300 parole revocation fine.

Defendant filed a timely notice of appeal.

## DISCUSSION

Defendant argues that the trial court erred in not suppressing his confession to Martinez under (1) *Miranda* and (2) due process.[3]  We independently review the trial court's legal

---

[3]    In supplemental briefing, defendant also seeks a sentencing remand pursuant to *People v. Duenas* (2019) 30 Cal.App.5th 1157 (*Duenas*).  Based on the constitutional guarantees of due process and excessive fines, *Duenas* held that trial courts may not impose three of the standard criminal assessments and fines—namely, the $30 court operations assessment (§ 1465.8), the $40 criminal conviction assessment (Gov. Code, § 70373), and the $300 restitution fine (Pen. Code, § 1202.4)—without first ascertaining the "defendant's present ability to pay." (*Duenas*, at pp. 1164, 1172, fn. 10.)  We need not decide whether we agree with *Duenas* because defendant is not entitled to a remand even if we accept *Duenas*.  That is because the record in this case, unlike the record in *Duenas*, indicates the

determinations on these issues but review its underlying factual

---

defendant has the ability to pay the $440 in assessments and fines that should have been imposed in this case (that is, $300 restitution fine and two sets of assessments, one for each of his two convictions).  (Cf. *People v. Bennett* (1981) 128 Cal.App.3d 354, 359-360 [remand for resentencing unnecessary where "the result is a foregone conclusion"].)  A defendant's ability to pay includes "the defendant's ability to obtain prison wages and to earn money after his release from custody." (*People v. Hennessey* (1995) 37 Cal.App.4th 1830, 1837; *People v. Gentry* (1994) 28 Cal.App.4th 1374, 1376-1377.)  Prisoners earn wages ranging from $12 per month (for the lowest skilled jobs) to $72 per month (for the highest).  (Dept. of Corrections, Operations Manual, §§ 51120.6, 51121.10 (2019).)  At these rates, defendant will have enough to pay the $440 in assessments and fines between 7 to 37 months, which is long before his 25 year sentence would end.  He would also be able to save up enough to pay the $300 parole revocation fine (which is only due if he violates parole) should he end up being paroled and violating parole.   Even if defendant does not voluntarily use his wages to pay the amounts due, the state may garnish between 20 and 50 percent of those wages to pay the restitution fine.  (§ 2085.5, subds. (a) & (c); *People v. Ellis* (2019) __ Cal.App.5th __ [2019 Cal.App. LEXIS 90, *5].)  The record also contains evidence that defendant, at the time of his crime, was employed and going to college.  Because defendant "points to no evidence in the record supporting his inability to pay" (*People v. Gamache* (2010) 48 Cal.4th 347, 409), and hence no evidence that he would suffer any consequence for non-payment, a remand would serve no purpose.

findings for substantial evidence. (*People v. Williams* (2010) 49 Cal.4th 405, 425 [*Miranda* determination]; *People v. Carrington* (2009) 47 Cal.4th 145, 169 [due process determination]; *People v. Tate* (2010) 49 Cal.4th 635, 686 [factual findings].)

## I.     *Miranda*

*Miranda* established the now-familiar rule that prosecutors may not admit a suspect's statements in their case-in-chief against the suspect-defendant unless (1) the defendant was advised that (a) "he has a right to remain silent," (b) anything he says "may be used as evidence against him," (c) "he has the right to the presence of an attorney," and (d) the defendant will be provided an attorney if he cannot afford one; (2) the defendant waived those rights, either expressly (by affirmatively indicating a waiver) or implicitly (by answering questions); and (3) prior to making the statements to be admitted, the defendant did not invoke either his right to remain silent or his *Miranda* right to an attorney. (*Miranda, supra*, 384 U.S. at pp. 444-445, 473-474, 476; *People v. Sauceda-Contreras* (2012) 55 Cal.4th 203, 218-219.)

Critically, however, *Miranda*'s rule has a limit: It only applies when the suspect-defendant was the subject of "custodial interrogation." (*Miranda, supra*, 384 U.S. at p. 444.) This limitation is a function of *Miranda*'s underlying rationale—namely, as a "constitutional rule" implementing the Fifth Amendment's privilege against self-incrimination. (*Dickerson v. U.S.* (2000) 530 U.S. 428, 440-444 (*Dickerson*).) The Fifth Amendment provides that "[n]o person . . . shall be *compelled* in any criminal case to be a witness against himself." (U.S. Const., 5th amend., italics added.) *Miranda* was the first case to acknowledge that "in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures

which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so." (*Miranda*, at p. 467.) Although the "informal," "psychological" pressures inherent in "incommunicado interrogation" do not themselves render a statement involuntary (*id.* at pp. 445, 449, 461; *Dickerson*, at p. 444), *Miranda* reasoned that those pressures nonetheless necessitate a "protective device"—namely, *Miranda*'s rule—to ensure that suspects do not make the type of compelled statements at the core of the Fifth Amendment's privilege (*Miranda*, at pp. 458, 465).

Defendant asserts that his confession to Martinez should have been suppressed for two independent reasons: (1) he invoked his *Miranda* right to counsel during the first interview and the police officers violated *Miranda* by subsequently sending Martinez to speak with him, and (2) the officers violated *Miranda* during the first interview, and that his subsequent confession to Martinez was the "tainted fruit" of that earlier violation.

**A.** ***Does defendant's prior invocation of his* Miranda *right to counsel require suppression of his statements to Martinez?***

Defendant argues that his repeated invocation of his *Miranda* right to counsel during the first interview precluded the court from admitting the confession obtained during his subsequent, arranged meeting with Martinez. For support, he cites *Edwards v. Arizona* (1981) 451 U.S. 477 (*Edwards*), which holds that a suspect's invocation of his *Miranda* right to counsel precludes "further police-initiated custodial interrogation" unless and until counsel is present or the suspect "initiates further communication" with the police. (*Id.* at pp. 484-485.) The People respond that defendant's confession to Martinez does not run afoul of *Miranda* because (1) Martinez was not an agent of the

11

police, and (2) defendant did not know Martinez was working with the police. For support of their second argument, the People cite *Perkins*, *supra*, 496 U.S. 292, which holds that "*Miranda* warnings are not required when the suspect is unaware that he is speaking to a law enforcement officer and gives a voluntary statement." (*Id.* at p. 294; accord *People v. Williams* (1988) 44 Cal.3d 1127, 1141-1142 [same].) Substantial evidence supports the trial court's findings that Martinez was an agent of the police when she met with defendant (because the officers implored her to "get an explanation" from defendant) and that defendant did not know Martinez was such an agent (because there is no evidence defendant knew of any of the conversations between Martinez and the officers). Accordingly, this case squarely presents the question: When a suspect invokes his *Miranda* right to counsel and law enforcement subsequently orchestrates a conversation between the suspect and someone the suspect does not know is an agent of law enforcement, which decision controls—*Edwards* or *Perkins*?

We conclude that *Perkins* controls, and we do so for three reasons.

First, the language in *Edwards* itself dictates that *Edwards* is inapplicable. *Edwards* fleshed out what *Miranda* meant when it said that "[i]f the individual states that he wants an attorney, the interrogation must cease until an attorney is present." (*Miranda, supra,* 384 U.S. at p. 474.) Specifically, *Edwards* held that a suspect who has invoked his *Miranda* right to counsel may not be "subject[ed] to further *interrogation* by the authorities" on any crime at all unless (1) counsel is present "at the time of [any further] questioning," or (2) the suspect "himself initiates further communication, exchanges or conversations with the police."

12

(*Edwards*, *supra*, 451 U.S. at pp. 484-485, italics added; *Arizona v. Roberson* (1988) 486 U.S. 675, 677 (*Roberson*); *Minnick v. Minnesota* (1990) 498 U.S. 146, 147, 153 (*Minnick*).)  By their terms, *Edwards* and its progeny have applied these restrictions only to further "interrogation" of the suspect.  (*Edwards*, at pp. 478, 482, 484-486; *Roberson*, at pp. 677, 680, 687; *Minnick*, at p. 157.)  Indeed, *Edwards* specifically noted "[a]bsent . . . *interrogation*, there would be no infringement of the [*Miranda*] right [to counsel] that Edwards invoked."  (*Id.* at p. 486, italics added; cf. *id.* at p. 485 ["nothing . . . would prohibit the police from merely listening to [a suspect's] voluntary, volunteered statements and using them against him at the trial."].)

For purposes of *Miranda*, "interrogation" means "express questioning" or "words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response."  (*Rhode Island v. Innis* (1980) 446 U.S. 291, 300-301 (*Innis*).)  Because interrogation "reflect[s] a measure of compulsion above and beyond that inherent in custody itself" (*id.* at p. 300), not all statements a defendant makes while in custody are "the product of interrogation" (*id.* at p. 299).  Whether the police action is "reasonably likely to elicit an incriminating response" is judged by what the suspect perceives, not what the police intend.  (*Id.* at p. 301.)  Implicit in the definition of "interrogation" is that (1) the suspect is talking to the police or an agent of the police, *and* (2) the suspect *is aware* that he is talking to the police or one of their agents.  This is why a suspect can be subject to "interrogation" when he knowingly interacts with the police or their agents.  (*Id.* at p. 295 [speaking with police]; *In re I.F.* (2018) 20 Cal.App.5th 735, 773 [same]; *In Interest of D.W.* (Ill. App. Ct. 1982) 108 Ill. App. 3d 1109, 1110-

13

1111 [same]; *People v. Ghent* (1987) 43 Cal.3d 739, 750-751 [speaking with psychiatrist retrained by the police]; *People v. Sanchez* (1983) 148 Cal.App.3d 62, 69-70 [speaking with doctor working with police in presence of police]; see also *Estelle v. Smith* (1981) 451 U.S. 454, 467-468 [speaking with prison psychiatrist pursuant to court order].)

Conversely, there is no "interrogation" when a suspect speaks with someone he does not know is an agent of the police. (*Arizona v. Mauro* (1987) 481 U.S. 520, 521, 526-529 [spouse]; *People v. Tate* (2010) 49 Cal.4th 635, 685-686 [possible accomplice/accessory]; *People v. Mayfield* (1997) 14 Cal.4th 668, 758 [father]; *People v. Leonard* (2007) 40 Cal.4th 1370, 1398-1402 [father]; *People v. Webb* (1993) 6 Cal.4th 494, 526 ["friend and lover"]; *People v. Thornton* (2007) 41 Cal.4th 391, 429-430, 432 [grandmother]; *People v. Jefferson* (2008) 158 Cal.App.4th 830, 840-841 ["friend[]" and "neighbor[]"].)  Because there is no "interrogation" in these circumstances, there is also no basis to apply *Edwards's* restrictions on further "interrogation."

Second, the rationale underlying *Miranda* dictates that *Perkins*, not *Edwards*, should control.  As described above, *Miranda*'s rule requiring a warning, a waiver and the cessation of questioning if a suspect invokes his *Miranda* rights is designed to dispel the "compelling" "psychological" "pressures" that are part and parcel of "in-custody interrogation."  (*Miranda*, *supra*, 384 U.S. at pp. 448-449, 461, 467.)  *Edwards's* rule is based on those same pressures:  A suspect's invocation of his *Miranda* right to counsel means "he is not capable of undergoing such questioning without advice of counsel," and "any subsequent waiver [by the suspect of his *Miranda* rights] . . . has come at the authorities' behest, and not at the suspect's own instigation. [Citation.]"

14

(*Roberson*, *supra*, 486 U.S. at p. 681.) *Edwards's* rule is accordingly "justified only in circumstances where th[ose] coercive pressures" exist. (*Maryland v. Shatzer* (2010) 559 U.S. 98, 115-116 (*Shatzer*).) This makes sense: *Edwards* implements *Miranda*, so should be limited to the evil *Miranda* was created to combat.

Because "[t]he essential ingredients of a 'police-dominated atmosphere' and compulsion are not present when an incarcerated person speaks freely to someone" that he thinks is a lover, a family member, a friend or even a fellow criminal (*Perkins*, *supra*, 496 U.S. at p. 296; *People v. Terrell* (2006) 141 Cal.App.4th 1371, 1386 ["there can be no coercion for *Miranda* purposes when the defendant is subjectively unaware of any police involvement in eliciting or recording his statements"]), *Miranda*'s (and, by extension, *Edwards's*) purpose in combating that atmosphere and compulsion is simply not implicated in such situations. To apply *Edwards* here is to require police to provide counsel while a suspect is speaking with a lover, family member or friend in what he (mistakenly) thought was a private conversation. This would undoubtedly discourage suspects from speaking to anyone and thus effectively convert *Edwards* into a rule automatically excluding all post-invocation statements, a result that *Edwards* itself acknowledged swept far beyond *Miranda*'s reach. (*Edwards*, *supra*, 451 U.S. at p. 486; see also *Shatzer*, *supra*, 559 U.S. at pp. 110-111 [post-invocation statements made after sufficient break in custody may be admitted].)

Third, and not surprisingly, California courts have uniformly come to the conclusion that *Perkins* controls when a suspect invokes his *Miranda* right to counsel but later speaks

15

with someone he does not know is an agent of the police. That was the holding of *Guilmette*, *supra*, 1 Cal.App.4th at pp. 1540-1541, and *Plyler*, *supra*, 18 Cal.App.4th at pp. 544-545.

Defendant resists this conclusion with what boil down to five categories of arguments.

First, defendant contends that *Perkins* should not control because *Perkins* did not involve a suspect who had previously invoked his *Miranda* right to counsel; *Edwards*, he urges, should control where there is such an invocation. For support, he cites two sources. He cites a footnote from Justice Brennan's concurrence in *Perkins*, where Justice Brennan opined that "[i]f [Perkins] had invoked either [his *Miranda* right to remain silent or his *Miranda* right to counsel], the inquiry would focus on whether he subsequently waived the particular right" and then proceeded to cite *Edwards*. (*Perkins*, *supra*, 496 U.S. at p. 300, fn. * (conc. opn. of Brennan, J.).) *Perkins* had a seven-Justice majority, however, so Brennan's concurrence was not the critical fifth vote; as a consequence, the concurrence is dicta. (E.g., *Maryland v. Wilson* (1997) 519 U.S. 408, 412-413.) Justice Brennan also makes no attempt to reconcile *Edwards's* limitation to post-invocation "interrogations" with his concession elsewhere in his concurrence that the "questioning" of Perkins in that case "does not amount to 'interrogation.'" (*Perkins*, at p. 300.) Defendant also cites the state appellate decision on remand from *Perkins*, where the court held that Perkins's conversation with the undercover agent constituted "interrogation." (*People v. Perkins* (Ill. App. Ct. 1993) 248 Ill. App. 3d 762, 771.) Curiously, however, that decision nowhere addressed the Supreme Court's prior decision in *Perkins* and, as a result, is simply incorrect in holding that the conversation constituted "interrogation."

16

Second, defendant asserts that the law otherwise dictates that conversations between a suspect and people he does not know are agents of the police constitute "interrogation," such that *Guilmette* and *Plyler* were wrongly decided. For support, he again cites two sources. He cites Justice Marshall's dissent in *Perkins*, where he opines that "[t]he Court does not dispute that the police officer here conducted a custodial interrogation of a criminal suspect." (*Perkins, supra,* 496 U.S. at p. 304 (dis. opn. of Marshall, J.).) Beyond the obvious facts that what is said in a dissenting opinion is usually the *opposite* of the court's holding and is in any event dicta, Justice Marshall's characterization of the *Perkins's* majority decision is at odds with both the majority opinion itself and, as noted above, with Justice Brennan's concurrence. Defendant also cites language in a footnote in *Patterson v. Illinois* (1988) 487 U.S. 285, stating that "a surreptitious conversation between an undercover police officer and an unindicted suspect would not give rise to any *Miranda* violation as long as the 'interrogation' was not in a custodial setting." (*Id.* at p. 296, fn. 9.) *Patterson* made this statement in the context of distinguishing the protections afforded by *Miranda* from those afforded by the Sixth Amendment under *Massiah v. U.S.* (1964) 377 U.S. 201. *Patterson* was not attempting to define the meaning of "interrogation" and, more importantly, *Patterson* came before *Perkins*. As the latter decided case that squarely addresses the issue, *Perkins* controls.

Third, defendant posits that even if *Guilmette* and *Plyler* are not wrongly decided, they are distinguishable. In each case, he points out, the suspect had been the one to initiate the post-invocation conversation that resulted in a confession. (*Guilmette, supra,* 1 Cal.App.4th at p. 1538; *Plyler, supra,* 18 Cal.App.4th at

p. 541.)  In this case, the evidence is conflicting over whether defendant was the one to suggest speaking with Martinez.  But even if we assume that the police orchestrated the conversation, what makes *Edwards* apply rather than *Perkins* is whether the suspect *knew* he was talking to a police agent, not who initiated that talk in the first place.

Fourth, defendant urges that even if his conversation with Martinez did not start out as an interrogation, it became one once the officer returned with a summary of the autopsy findings and asked if either parent had "anything [they] want[ed] to say."  Had defendant answered the officer's question with an incriminating statement, he would have been interrogated.  But he did not.  Instead, defendant said nothing, and the officer left.  At that point, defendant resumed his one-on-one conversation with Martinez, completely unaware she was an agent of the police.  His subsequent confession to her was accordingly not the product of an interrogation.

Lastly, defendant argues that the police engaged in a "persistent, underhanded attempt . . . to obtain a confession" by blatantly disregarding his repeated requests for counsel and then orchestrating a tearful confrontation with his girlfriend and the mother of his now-dead infant.  The police conduct in this case was deplorable.  (Accord, *Missouri v. Seibert* (2004) 542 U.S. 600, 616 (plurality) [decrying "police strategy adapted to undermine the *Miranda* warnings"].)  But the question we must decide is whether it is *unconstitutional*.[4]  *Miranda* is not a free-floating

---

[4]     Orchestrating the conversation between defendant and Martinez clearly constitutes "deliberate elicitation" within the meaning of the Sixth Amendment.  (*Kuhlmann v. Wilson* (1986)

18

bulwark against unfair police tactics.  Constitutional rules are anchored to their rationales (*Shatzer*, *supra*, 559 U.S. at p. 106 ["A judicially crafted rule is 'justified only by reference to its prophylactic purpose . . .' [Citation]"]), and *Miranda*'s rule is moored to its purpose of "preventing government officials from using the coercive nature of confinement to extract confessions" (*Mauro*, *supra*, 481 U.S. at pp. 529-530; *Oregon v. Elstad* (1985) 470 U.S. 298, 304-305 (*Elstad*) [*Miranda* is designed to combat the "psychological pressures to confess emanating from . . . official coercion"]).  "*Miranda* forbids coercion," the Supreme Court has said, "not mere strategic deception by taking advantage of a suspect's misplaced trust in one he supposes to be" someone he can trust.  (*Perkins*, *supra*, 496 U.S. at p. 297.)  To construe *Miranda* to reach the non-coercive police conduct in this case is to untether *Miranda* from its purpose and, in so doing, undermine its legitimacy as one of the many bulwarks protecting the constitutional rights of criminal defendants.  We decline to sully *Miranda* in this fashion.

---

477 U.S. 436, 473 (plurality opinion).)  But this is doubly irrelevant:  Not only is the Sixth Amendment's "primary concern" with stopping "secret interrogation" different from *Miranda*'s concern with stopping the coercion inherent in incommunicado interrogation (*id.* at p. 459; *Roberson*, *supra*, 486 U.S. 675, 685), but the Sixth Amendment is also inapplicable here because defendant was not yet formally charged with any crime at the time of his confession (*Moran v. Burbine* (1986) 475 U.S. 412, 428 (*Moran*)).

**B.** *Is defendant's confession to Martinez the tainted fruit of his first interview?*

Defendant alternatively argues that, even if his confession to Martinez was not the product of an interrogation barred by *Edwards*, *supra*, 451 U.S. 477, the confession must nevertheless be suppressed because it is the fruit of the first interview during which the police violated his *Miranda* rights by continuing to interrogate him despite his repeated invocation of his *Miranda* right to counsel. For support, defendant cites *People v. Montano* (1991) 226 Cal.App.3d 914 (*Montano*).

When the police violate a suspect's *Miranda* rights, the statement immediately resulting from that violation is inadmissible in the prosecution's case-in-chief. (*Miranda, supra*, 384 U.S. at pp. 444-445.) That violation may also warrant suppression of subsequent statements obtained as a result of the initial violation. (*People v. Storm* (2002) 28 Cal.4th 1007, 1027.) However, because a violation of *Miranda* does not necessarily result in a confession that is "compelled" within the meaning of the Fifth Amendment (*Dickerson, supra*, 530 U.S. at 444; *Elstad, supra*, 470 U.S. at p. 310), an initial *Miranda* violation does not "inherently taint[]"—and thus warrant suppression of—all subsequent statements (*Elstad,* at p. 307). Instead, a defendant seeking to suppress a statement as the tainted fruit of a *Miranda* violation must establish that any subsequent confession was involuntary. (*Storm,* at pp. 1029-1030; *People v. Case* (2018) 5 Cal.5th 1, 23-26 (*Case*); *People v. Bradford* (1997) 14 Cal.4th 1005, 1039-1041 (*Bradford*).) We adjudge whether a confession was voluntary by looking to the totality of the circumstances. (*Moran, supra*, 475 U.S. at p. 421.)

Applying these standards, defendant's confession to Martinez was not the suppressible fruit of an earlier *Miranda*

20

violation.  Significantly, the officers' initial *Miranda* violation in questioning defendant despite his repeated request for counsel did not produce any confession.  Instead, defendant steadfastly maintained his innocence.  This is accordingly not a case where the initial *Miranda* violation produced a confession that, once made, put pressure on a suspect to reaffirm that prior confession; in this case, the proverbial "cat" never got out of the "bag."  Further, and for the reasons outlined in detail above, defendant's statements to Martinez were voluntary because he (mistakenly) believed he was having a private conversation with his girlfriend; he had no idea that police were exerting any pressure on him at all.

*Montano* does not dictate a different result.  *Montano* held that a police officer's repeated refusal to honor a suspect's invocation of his right to remain silent under *Miranda* by itself constituted "coercion" that automatically rendered any subsequent confession the tainted "fruit" of that earlier violation.  (*Montano, supra*, 226 Cal.App.3d at pp. 933-934.)  Our Supreme Court subsequently rejected *Montano's* holding when it ruled that "continued interrogation after a defendant has invoked his" *Miranda* "right[s]" does not "inherently constitute coercion." (*Bradford, supra*, 14 Cal.4th at p. 1039; *Storm, supra*, 28 Cal.4th at pp. 1031-1033.)  Indeed, *Storm* went so far as to declare *Montano* to be "not" "persuasive" on this precise point.  (*Storm*, at p. 1037, fn. 13.)

## II.    Due Process

Defendant argues that his confession should have been suppressed as obtained in violation of due process because the police officers (1) deliberately ignored his repeated requests for counsel during the first interview and thereafter sent Martinez in

21

to "get the full explanation" from him; and (2) highlighted the seriousness of the crime, threatened to arrest him and put him in jail if he did not "explain what happened" and stated that he and Martinez were "looking at going to jail for child neglect."  The People respond that defendant cannot raise a due process-based objection now because he did not do so before the trial court.

### A.    *Forfeiture*

Defendant has forfeited any due process challenge to his confession.  His motion to suppress was based solely on *Miranda*, and our Supreme Court has held that a *Miranda*-based objection to a confession is legally distinct from a due process-based objection; one objection does not preserve the other for appellate review.  (*People v. Ray* (1996) 13 Cal.4th 313, 339.)  However, because defendant responds that his counsel was constitutionally ineffective for not making a due process-based objection, we elect to exercise our discretion to reach the merits of his due process claim.

### B.    *Merits*

The constitutional right to due process secured by the federal and California Constitutions mandates the suppression of an involuntary confession.  (*People v. Linton* (2013) 56 Cal.4th 1146, 1176 (*Linton*).)  For these purposes, a confession is involuntary if official coercion caused the defendant's will to be overborn, such that the resulting statement is not the product of "'"'a rational intellect and free will'" [citation].'"'  (*Ibid.*; *People v. Guerra* (2006) 37 Cal.4th 1067, 1093 (*Guerra*), overruled on other grounds by *People v. Rundle* (2008) 43 Cal.4th 76.)  We judge whether a confession was involuntary by examining the totality of circumstances surrounding the confession.  (*Linton*, at p. 1176; *Guerra*, at p. 1093.)

1.     *Officers' circumvention of Miranda*

The officers' deliberate circumvention of *Miranda*'s protections by disregarding defendant's requests for counsel and orchestrating the monitored conversation between defendant and Martinez did not violate due process.

Due process requires coercion and, for the reasons set forth above, defendant's statements to Martinez were not coerced because, as far as he knew, he was talking to his girlfriend. (Accord, *Webb*, *supra*, 6 Cal.4th at p. 526 [finding no coercion under *Miranda* because "[f]rom defendant's perspective, he was talking with a friend and lover"].)  The officers' behind-the-scenes manipulation is, at most, a form of deception, but "'[p]olice trickery . . . does not, by itself, render a confession involuntary.'" (*People v.  Mays* (2009) 174 Cal.App.4th 156, 164-165.)  The trickery here consisted of placing defendant in a room with someone he trusted to see if he would talk.  Because the "proximate caus[e]" of his ensuing confession was *the conversation*—and not the deceptive act of orchestrating its occurrence—the requisite proximate causal link between the police stratagem and defendant's confession is missing.  (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1240.)

Absent a showing that the police conduct in this case independently violates *due process*, defendant is effectively asking us to expand *Miranda* under the aegis of due process. This we may not do:  "Where," as here, "a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of ""substantive [or procedural] due process," must be the guide for analyzing these claims.'" (*Albright v. Oliver* (1994) 510 U.S. 266, 273, quoting

23

*Graham v. Connor* (1989) 490 U.S. 386, 395; see also *Portuondo v. Agard* (2000) 529 U.S. 61, 74; cf. *Doyle v. Ohio* (1976) 426 U.S. 610, 617-618 [due process prohibits use of a defendant's silence after receiving *Miranda* warnings because such use independently violates due process, as it is "fundamentally unfair" to use a suspect's post-warning silence after implicitly promising not to do so].)

        2.    *Warnings about severity of penalty and threats of jail*

The officers' reminders to defendant that the penalty for causing Mia's death was severe, their threat to arrest him immediately if he did not "explain what happened" (by promising not to immediately arrest him if he did), and their reminder that he (and Martinez) were "looking at going to jail" for Mia's death did not violate due process. Law enforcement does not violate due process by informing a suspect of the likely consequences of the suspected crimes or of pointing out the benefits that are likely to flow from cooperating with an investigation. (*People v. Holloway* (2004) 33 Cal.4th 96, 115-116 [recounting consequences]; *People v. Williams* (2010) 49 Cal.4th 405, 442-443 [same]; *People v. Spears* (1991) 228 Cal.App.3d 1, 27-28 [benefits that flow from cooperation].) The officers' conduct in emphasizing the severity of the crime at issue and telling defendant that he was "looking at going to jail" for that crime did not transgress these limits. The officers' promise not to arrest defendant immediately if he confessed presents a closer question, but there is no causal link between that promise to give defendant a temporary reprieve from custody if he confessed for the simple reason that that promise did not produce any confession. To the contrary, defendant steadfastly stuck to his initial story and continued to request an attorney. As our

24

Supreme Court recently observed, a defendant's "steadfast[] mainten[ance]" of his "innocen[ce]" "tends to undercut the notion that his free will was overborne by the [officer's] remarks." (*Case, supra*, 5 Cal.5th at p. 26.)

## DISPOSITION

The judgment is affirmed.

## <u>CERTIFIED FOR PARTIAL PUBLICATION.</u>

_____, J.
HOFFSTADT

We concur:


_____, P. J.
LUI


_____, J.
CHAVEZ